Robert HURWITT, Morris W. Hirsch, Jerry Rubin, Stephen Smale, Stephen Weissman, individually and as members of the Vietnam Day Committee, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The CITY OF OAKLAND, A Municipal Corporation, John C. Houlihan, Mayor and Presiding Officer of the City Council of Oakland, Edward Toothman, Chief of Police, Oakland, John A. Morin, Acting City Manager, Oakland, Defendants.

No. 44320.

United States District Court
N. D. California, S. D.

Nov. 17, 1965.

Benjamin Dreyfus, San Francisco, Cal., Peter Franck, Berkeley, Cal., Donald A. Kerson, San Francisco, Cal., Fay Stender, Berkeley, Cal., Marvin Stender, San Francisco, Cal., Arthur Wells, Jr., Berkeley, Cal., for plaintiffs.

J. F. Coakley, Dist. Atty., of Alameda County, R. Robt. Hunter, Chief Asst. Dist. Atty., Richard J. Moore, Asst. Dist. Atty., Thos. J. Fennone, Deputy Dist. Atty., Hilton J. Melby, City Atty., and George M. Cahalan, Deputy City Atty., Oakland, Cal., for defendants and intervenor Alameda County.

SWEIGERT, District Judge.

This case comes before the Court upon an order requiring defendants to show cause why a preliminary injunction should not issue restraining them from prohibiting a certain parade planned by plaintiffs for November 20, 1965 in the Cities of Berkeley and Oakland.

The Court has determined that it has jurisdiction of the subject matter herein under the provisions of 62 Stat. 932

(1948), 28 U.S.C. Sec. 1343 (1964) and 17 Stat. 13 (1871), 42 U.S.C. Sec. 1983 (1964).

The five named plaintiffs allege that they are members of a Vietnam Day Committee, an unincorporated association of individuals, who, together with other persons too numerous to designate, intend to and have announced their intention to peaceably assemble and march from the University of California in Berkeley to Maritime Avenue in the City of Oakland on Saturday, November 20, 1965, to communicate to their government and to the community their opposition to certain acts of the United States government—its foreign policy concerning the war in Vietnam—and to petition their government for a redress of their grievances; that on October 27, 1965, plaintiffs duly applied to the defendants—the City of Oakland, a municipal corporation, John C. Houlihan, Mayor and Presiding Officer of the City Council of Oakland, Edward Toothman, Chief of Police, Oakland and John A. Morin, Acting City Manager, Oakland—for a parade permit for their march of November 20, 1965.

On November 12, 1965, Acting City Manager Morin denied plaintiffs' application for a parade permit. In substance and effect the denial ((plaintiffs' Exhibit #3) is based upon the following reasons: (1) The City Manager's determination that the parade will be held in darkness; (2) that the plaintiffs and their proposed parade are loosely organized; (3) that there is a probability of civil disobedience by the marchers; (4) that there will be serious traffic congestion; (5) that there is a probability of counter demonstrations by others opposed to the plaintiffs' views and to the march; and, (6) the difficulties and expense of affording adequate police supervision.

Under the Oakland Municipal Code an appeal lies from the decision of the Oakland City Manager to the Oakland City Council. Plaintiffs appealed the decision of the Acting City Manager to the Oakland City Council, and on November 16, 1965, the Oakland City Council affirmed the decision of the Acting City Manager.

## PLAINTIFFS' CONTENTIONS

In their application, the plaintiffs make the following contentions:

(1) That Sections 3–6.08 and 5–2.05 of the Oakland Municipal Code (see Appendix "A") are vague, ambiguous and leave the decision as to whether a parade permit shall be granted to the unfettered discretion of the Oakland City Manager, without any constitutional standards to guide his discretion and are, therefore, unconstitutional, in that they deny and are a prior restraint on plaintiffs' rights of freedom of speech, assembly, association and petition as guaranteed by the First and Fourteenth Amendments to the Constitution of the United States, and the rights secured to them by 17 Stat. 13 (1871), 42 U.S.C. Sec. 1983 (1964).

(2) That defendants are using Sections 3–6.08 and 5–2.05 to deprive the plaintiffs of their rights of free speech, assembly and association.

(3) That defendants have acted arbitrarily and discriminatorily in failing to grant plaintiffs a permit in that such permits have in the past been issued to similarly situated groups and in that plaintiffs have been denied the equal protection of the laws.

## THE APPLICATION FOR THE PARADE PERMIT

The application filed with the Oakland City Manager on October 27, 1965, asks for a parade permit to hold a protest march numbering from 5,000 to 20,000 marchers, on November 20, 1965 between 1:30 p. m., to 7:00 p. m., from the Oakland city border at Adeline Street, south on Adeline Street to San Pablo Avenue, across San Pablo Avenue to Peralta Street, south on Peralta Street to 7th Street, west on 7th Street to Maritime Street, north on Maritime Street to the north end of Maritime Street, turn 180 degrees around and march south on Maritime Street to 7th Street and east on 7th Street to a vacant lot at 7th and Peralta Streets, where a rally will be held, commencing at about 5:00 p. m., and lasting one to three hours, whereupon the marchers will disperse. Plaintiffs esti-

mate that the march itself will take three and one-half hours.

The total length of the march is about 7 miles. The first two miles of march will be within the City of Berkeley for which portion of the march the City of Berkeley has granted a permit (plaintiffs' Exhibit #1). The next five miles of the march will be within the City of Oakland.

The Court notes that the ultimate destination of the march is a rally site at a vacant lot at 7th and Peralta Streets, Oakland. The planned march, however, will pass this objective upon first arrival there and continue beyond it, along 7th Street and then Maritime Street, and then double back along Maritime and 7th Street to the 7th and Peralta Streets rally site. According to plaintiffs, this departure from a direct route to the rally site is designed to bring the marchers along Maritime Street, whereon there are frontage entrance ways to the Oakland Army Base, a point of embarkation for United States Army personnel en route to Vietnam. The rally site at 7th and Peralta Streets is about one mile from the Oakland Army Base.

According to plaintiffs' Vietnam Day Committee, one of the purposes of the march is to protest American intervention in Vietnam and to "picket the Oakland Army Terminal because the Terminal is an important depot for war equipment and troops bound for Vietnam (and) as such, it symbolizes American intervention in Vietnam. * * * "

## BACKGROUND OF PREVIOUS APPLICATIONS AND MARCHES

The plaintiffs allege that they previously applied on October 5, 1965, to the City of Oakland for a parade permit to march on October 15, 1965 for a similar purpose but that on October 14, 1965 they were notified in writing by defendants, through defendant Morin, Acting City Manager, that their application was denied.

The denial notification (Exhibit B of the complaint) refers to the aforesaid sections of the Oakland Municipal Code and states: "It is my opinion that conflict, violence or other disturbance of the public peace and/or serious traffic congestion may result if this permit is granted" and "consideration of previous activities of the Vietnam Day Committee indicates that acts contrary to the 'health, safety and general welfare of the public' have occurred." The denial notification adds that certain deviations in respect to the time and route of march, which were proposed at a hearing on October 13, 1965, were considered but did not, in the opinion of the City Manager obviate the basic findings noted above.

The plaintiffs allege that on October 15, 1965, following the denial of a permit, they, together with some 15,000 other persons, peaceably assembled at approximately 7:30 p. m., on the campus of the University of California in Berkeley and marched in an orderly fashion through the City of Berkeley to the border separating Berkeley from Oakland; that at the border they were confronted by defendants and police officers of the City of Oakland, who had barricaded said border and who threatened to arrest anyone in the said peaceful and orderly march, who entered the City of Oakland, for violating Sections 3-6.08 of the Oakland Municipal Code; that plaintiffs then marched to a site in said City of Berkeley.

The plaintiffs allege that on the following day, October 16, 1965, they and some 5,000 other persons again peaceably assembled in the City of Berkeley and marched to the Berkeley-Oakland border where they were again confronted by defendants and police officers of the City of Oakland, who had barricaded said border; that defendants again announced that any member of said parade, who entered the City of Oakland, would be arrested for violating Section 3-6.08.

Plaintiffs allege that at no time, either on October 15, 1965, or October 16, 1965, did plaintiffs or any other members of said peaceful and orderly marches disturb the public peace or act in any manner contrary to the health, safety and general welfare of the public.

An affidavit of plaintiff, Robert Hurwitt, a member of the Vietnam Day Committee and a Monitor Captain for the Committee, sets forth in greater detail the preparation, organization and events pertaining to these two previous marches of October 15th and October 16, 1965.

In substance and effect the affidavit avers that these marches were preceded by several weeks of preparation, recruitment of about 100 monitors, organization of monitor, scout and messenger squads and meetings with Captain William Beall of the Berkeley Police Department; that attempts to arrange similar meetings with Deputy Chief Preston of the Oakland Police Department were unsuccessful because phone calls were not returned.

This affidavit further avers that the October 15th march moved in an orderly fashion down Telegraph Avenue with full cooperation of the Berkeley police and without serious incident—except for hecklers and troublemakers from among spectators; that, upon being informed by the Berkeley Police Department that there was a potentially dangerous situation—an Oakland police department cordon across Telegraph Avenue at the border, a crowd of spectators to see what would happen when the march reached Oakland and about 100 pro-Vietnam war demonstrators—the committee abandoned its intention of coming up to the Oakland police cordon and changed the route of march to the Berkeley Civic Center where a planned "teach in" took place during the night despite some march obstructors, some hecklers and the throwing of a tear gas bomb from an adjacent building; that the march and teach-in were conducted with the cooperation of the Berkeley Police Department.

The affidavit goes on to aver that on the following day, October 16th, after further organization and a survey of the route with Captain Beall of the Berkeley Police Department, including showing Captain Beall where the march would stop if again confronted by Oakland police at the border, another march proceeded; that, when the advance unit reached the Berkeley-Oakland border, it halted before the Oakland police cordon which was blocking the street; that the sidewalk was blocked by about a dozen members of the so-called Hell's Angels motorcycle club; that several Hell's Angels broke through a line of Berkeley Police and Alameda County Sheriff's deputies, ran behind a sound truck, ripped a front banner from the marchers and ran toward the monitor line from the rear; that the monitors linked arms to prevent the Hell's Angels from attacking the marchers; that in the ensuing trouble a Berkeley police officer's leg was broken and several of the monitors were badly hurt; that the marchers sat on the ground and remained quiet and calm throughout this episode of violence; that police then separated marchers from spectators and there were no further incidents and at the end of a three hour rally the marchers dispersed quietly.

## DEFENDANTS' CONTENTIONS

Defendants, and Intervenor, the County of Alameda, contend, upon the basis of supporting affidavits on file herein, that (1) Plaintiffs have not shown irreparable injury entitling them to injunctive relief; (2) that prior conduct of plaintiffs is such that, considered on balance with the difficulties and expense of supervision of the planned parade, the equities should be resolved against plaintiffs; and, (3) that in any event, plaintiffs should be required to give a security bond under Rule 65(c) F.R.Civ.P.

Plaintiffs, however, have filed counter affidavits which in substance and effect deny their prior marches on October 15 and 16 were not orderly and peaceful.

## THE LAW

It is established beyond need for an extended discussion that municipalities cannot validly leave decision making for allowance of peaceful parades or demonstrations to the unbridled discretion or mere opinion of a local official. The lodging of any such broad discretion in a public official would permit such official to say which expressions of view—which parades and demonstrations will be per-

mitted and which will not be permitted—a power fraught with possibilities for selective administration that would in effect deprive some groups of the equal protection of the laws.

■ It is also well established that peaceful, orderly expressions of views—through marches, demonstrations or otherwise—cannot be prohibited, or othwise interfered with, merely because the views expressed may be so unpopular at the time as to stir the public to anger, invite dispute, and thus create, or appear to the public authorities or police to create, unrest or even disturbance.

This is so because under such a doctrine, unpopular political groups might be rendered virtually inarticulate. One of the high purposes of freedom of speech under our system of government is to invite dispute. Pressing for acceptance of a currently unpopular idea is often provocative and challenging as it strikes at existing preconceptions or convictions.

■ Under such circumstances suppression by public officials or police of the right of free speech and assembly cannot be made an easy substitute for the performance of their duty to maintain order by taking such steps as may be reasonably necessary and feasible to protect peaceable, orderly speakers, marchers or demonstrators in the exercise of their rights against violent or disorderly retaliation or attack at the hands of those who may disagree and object.

■ It is equally well established, however, that appropriate, limited discretion under properly drawn statutes or ordinances concerning the time, place, duration or manner of use of streets for public assemblies may be vested in administrative officials, provided such limited discretion is exercised with uniformity of method of treatment upon the facts of each application, free from improper or inappropriate consideration and from unfair discriminations and with systematic, consistent and just order of treatment with reference to the convenience of public use of highways.

■■ The rights of free speech and assembly, while fundamental in our democratic society, do not mean that everyone with opinions or beliefs to express may address a group at any place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by attempts to exercise some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.

Those who desire to communicate their ideas by conduct, such as patrolling, marching and picketing on streets and highways, are in this respect in a somewhat different position from those who communicate their ideas by mere speech or written publication.

These views have been enunciated by the Supreme Court of the United States as recently as January 18, 1965, in Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). See also Hague v. Committee for Industrial Organization, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); Niemotko v. State of Maryland, 340 U.S. 268, 71 S.Ct. 325,

95 L.Ed. 267 (1951); Poulos v. State of New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L. Ed.2d 697 (1963).

## THE ISSUE IN THIS CASE

■ Since no one stands criminally charged with violation of Sections 3–6.08 and 5–2.05 of the Oakland Municipal Code, it is not necessary at this time to decide whether, as plaintiffs contend, the aforesaid sections of the Oakland Municipal Code are unconstitutional on their face. It is enough to decide whether in the pending case these ordinances are being unconstitutionally, rather than validly, applied to the plaintiffs in this particular case. In order to make that determination the Court must look to the parade application of the plaintiffs and to all of the facts and circumstances, so far as they are shown by the evidence and the affidavits in this case, bearing on the reasonable requirements of the public convenience and safety.

Before considering the evidence before us, it will be helpful to note the approach taken by United States District Judge Frank M. Johnson, Jr., in a case which, although not identical, is sufficiently comparable to offer guidelines to the pending case.

In Williams v. Wallace, 240 F.Supp. 100 (M.D. Ala. March 17, 1965) the United States District Court granted injunctive relief to protect the rights of plaintiffs to assemble, demonstrate and march peaceably for four days along forty-five miles of a main public highway between Selma and Montgomery, Alabama.

The Court in the Williams v. Wallace case, supra, reviewed the background of the plaintiffs' efforts to register as voters, and their previous demonstrations for that purpose. The Court there pointed out that the right of petition for redress of grievances might be exercised in large groups; that there is a right of assembly and petition—even by mass demonstrations—marching—even along public highways—so long as peaceful and orderly; that this right is not to be abridged so long as there is no unreasonable interference with the exercise of the right of others to use the streets and highways and to have police protection; that the right to march along public highways is subject to greater regulation than other forms of expression and that, therefore, greater abridgment of the right may be warranted depending on the circumstances.

The Court recognized that public authorities have the duty and responsibility of keeping the streets and highways open and to impose reasonable regulations designed to assure the safety and convenience of the people, adding: "There is room in our system * * * for both, once the proper balance is drawn."

Pointing out that the reasonable use of streets and highways for pedestrian marching is constitutionally guaranteed, that Court held that public hostility to the march would not justify denial of the right, that threats of violence would not constitute an excuse, holding that plaintiffs were entitled to police protection by the authorities.

The Court found that the proclamation of the Governor of Alabama, absolutely banning any march by any marchers—regardless of how conducted—was unreasonable.

In that case the plaintiffs, recognizing that their right to parade was not an unrestricted right—but one to be exercised within reasonable bounds, presented a "plan of march" to the Court. That plan provided no limitation as to the number of marchers on the four lane portion of the highway but did provide a limitation of 300 on other portions. It further provided that the march proceed on shoulders of the highway—left side facing traffic —two abreast—and single file where the shoulder narrows and at bridges without sidewalks. It further provided that the march be organized in sections of 50— each under a leader and that supporting services be provided with a regular daily schedule of stops. The plan, as presented,

provided that there would be no night marching.

Although the Court recognized that a considerable burden would be imposed upon law enforcement officers, the Court found the plan to be reasonable and issued an injunction against interference with a march so conducted and regulated.

It may be further noted that by way of precedent that in Immanuel Missionary Baptist Church v. City of Oakland, Civil No. 40667, (N.D. Calif. April 21, 1962) this Court (Carter, J.) found it necessary to restrain the City of Oakland from interfering with first amendment constitutional rights. In that case the Court granted a Temporary Restraining Order enjoining the City of Oakland from interfering with the peaceful assembly of persons at the Immanuel Missionary Baptist Church for the purpose of conducting religious services therein.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ Upon the evidence herein, as it has been ably presented by counsel, the Court finds that it would be unreasonable, arbitrary and in abuse of any discretion reposed in the officials of the City of Oakland, and an invalid interference with basic constitutional rights, to simply and unqualifiedly deny a permit to the plaintiffs for permission to march on the streets of Oakland, or to otherwise unqualifiedly prohibit or interfere with the march by the plaintiffs, or their Vietnam Day Committee, or others similarly situated, within the City of Oakland.

■ The same evidence, however, does show, and the Court finds, that certain limitations are necessary and reasonable bearing on the time, place, duration and manner of the use of the streets of the City of Oakland, and its duly constituted officials, in the discharge of their admitted right to regulate the use of city streets and other facilities to assure the convenience and safety of all the people, including the plaintiffs, that is, the marchers themselves, in the use of the streets concomitantly with the rights of the plaintiffs to free speech and assembly.

In the instant case the Court finds that any departure of the march from the direct route to its ultimate destination, that is, the rally site at 7th and Peralta Streets, Oakland, will necessarily involve the passage of these marchers, estimated by the plaintiffs to number from 5,000 to 20,000 people, along 7th Street through a comparatively narrow railroad track underpass in order to reach and march along Maritime Street, whereon fronts the Oakland Army Base, and, further, according to the plan of march, a turning about of the marchers at the end of Maritime Street and a doubling back of the march to return along the same route in such manner that the head and forefront ranks of the parade would, in all reasonable probability, have to parallel the rear ranks and tail of the parade and thus increase the street congestion and intensify the bottleneck effect of the underpass.

This 7th Street underpass is about 21 feet wide, allowing only one lane of traffic in each direction, with only a 6-foot wide pedestrian walkway. At this underpass the march along 7th Street would have to narrow to about seven persons abreast.

If the marchers continue through this underpass along 7th Street to Maritime Street and then make a complete turnaround at its north end to double back by the same route, it would be necessary for the forefront marchers to accumulate and wait approximately an hour and a half or more until the remainder of the marchers cleared the underpass before the head of the parade could proceed back to the rally site at 7th and Peralta.

Further, this underpass is one of only two means of access to Maritime Street and the Oakland Army Base fronting thereon. The only other access comes from another direction—from the Bay Bridge.

An affidavit of Col. Albert, Director of Terminal Operations at the Base, shows that this Base is in continuous operation without exception for Saturday,

Sunday or holidays, for the purpose of troop staging and that access to Maritime Street to and from the Base is necessary at all times.

The physical conditions of this portion of the proposed march present, to say the least, a formidable problem of supervision by the public officials and the police of the City of Oakland who are responsible for maintaining order and protecting the convenience and safety of the public, including the marchers themselves, as well as crowds of spectators who may be reasonably expected to be attracted to this area of close contact between the marchers and the Oakland Army Terminal which they have publicized as a symbolic object of their picketing.

In addition, the background of this march, that is, the previously attempted marches for a similar purpose indicates, and puts the public officials and police of the City of Oakland on notice, that there is a probability of repetition of acts of violence from spectators or other demonstrators opposed to the views and purposes of the marchers. For such an eventuality the police, having been alerted, must be correspondingly organized and prepared in order to assure their ability to perform their duty of adequately protecting the marchers themselves.

This factor will further enlarge the practical duties and problems of the police to adequately supervise the total route of the march which, if it includes the 7th Street underpass and Maritime Street portion of the march, will impose requirements upon the Oakland public officials beyond the limits of reasonable feasibility.

The Court further finds that, if the march route includes the portion of the route which I have referred to, there is reasonable probability that the termination of the march at its announced destination, that is, the rally site at 7th and Peralta Streets, will be delayed until after sundown and thus will be added the factor of darkness to further enlarge the police requirements beyond the limits of reasonable feasibility.

According to the affidavit of Lt. Long of the Oakland Police Department, assuming the maximum estimate of 20,000 marchers along the whole route as presently planned, moving at two miles an hour in an unbroken line without interruption for traffic and with ten marchers abreast, the head of the march would not arrive at the 7th and Peralta Streets site until 8:25 p. m., and the rear, the tail end of the marchers, would not reach there until midnight, and thus about 50 per cent of this march would be after dark.

Dispersal of marchers and spectators from the rally site might well be delayed beyond midnight at a place where only one regular bus line after midnight is available to get the crowds out of the vicinity.

If, however, the portion of the march beyond 7th and Peralta is eliminated, Lt. Long estimates that the head of the marchers would be able to reach 7th and Peralta Streets, by about 3:00 p. m., and the total marchers could be there about 6:00 p. m.

The Court is of the opinion and finds that for these reasons the particular portion of the march above referred to would impose upon the public officials and police of the City of Oakland requirements for adequate supervision which, when coupled with their supervision requirements of other portions of the proposed march, would not be within the limits of reasonable feasibility considered in the light of available resources, funds and personnel of the City of Oakland.

According to Chief Toothman's affidavit, the largest number of police officers which can reasonably be mustered by augmenting the normal Saturday police force is 375 officers. Two hundred and fifty-three of them would be committed for traffic control along the route, leaving 122 officers for general control of the marchers and spectators. If the parade takes place along the presently planned total course, these 122 officers, in addition to those on traffic detail, would be utilized in a spread, according to the

Chief, of about two officers every 500 feet.

 The Court finds that the elimination of the portion of the route hereinabove referred to, when considered on balance with the requirements of the police for adequate supervision and protection, will not unreasonably interfere with the right of free speech or assembly of the plaintiffs, and others situated, especially in view of the fact that under a plan of march thus modified the ultimate objective of the march will be achieved, that is a publicized rally at 7th and Peralta Streets, Oakland, which is a place about a mile from the Oakland Army Terminal but, nevertheless, in the general vicinity of it.

As argued by defendants at the hearing, the passage of a large number of marchers along Maritime Street, whereon fronts the Oakland Army Base, wherein army personnel are being organized for embarkation to Vietnam, would reasonably be expected, when considered with the avowed purpose of the proposed march, i. e., picketing of that Base in protest against the Vietnam war—to generate from the marchers acts which might fall, or appear to fall, within the provisions of 62 Stat. 811 (1948), as amended, 18 U.S.C. Sec. 2387 (1964), and for which acts the appropriate law enforcement officers would have to be alerted.

Although it is not necessary to place the Court's finding of the reasonableness of the modification of the march on this factor, it does add a further feature to enlarge and extend the responsibilities of law enforcement officials for the maintenance of law and order.

Upon consideration of the evidence in this record, the Court finds that it is necessary and within the bounds of reasonable regulation for the city officials of Oakland, and police authorities, and the City Manager of Oakland, to require that the proposed march be modified so that it goes directly along the straight streets of Adeline and Peralta to 7th and Peralta Streets—its publicized rally site.

The Court further finds that it is necessary and reasonable to require such changes in the plan of march as will assure that this parade and assembly be completed in the daylight. Darkness, combined with a very large assembly of people, multiplies the problems and increases the difficulties of the police for proper supervision in the performance of their duty to maintain public convenience and to protect the safety of the public— including the marchers.

The Court further finds that it is necessary and reasonable to require that plaintiffs obtain permission from whomever is in charge of the vacant property on which they expect to hold their rally at 7th and Peralta Streets. If at the last moment a question should arise about their right to use that property without trespassing, there would be an accumulation of people in the streets that would present a very difficult problem for the police—even in the daytime.

 The Court further finds that any lack of established organization of plaintiffs' committee is not such as to reasonably justify a refusal to permit their proposed march under reasonable conditions and regulations.

The Court further finds that plaintiffs and others similarly situated, if denied permission to march under reasonable conditions and regulations, will suffer irreparable injury in that they will be denied their constitutional right of free speech, assembly and petition.

 The Court further finds that prior conduct of some individuals in the month of June, 1965 and the month of August, 1965, is not such as to reasonably justify a refusal to permit plaintiffs and others similarly situated, to march on November 20, 1965 under reasonable conditions and regulations.

 The Court further finds that no costs or damages will be incurred or suffered by defendants as a result of issuance of a preliminary injunction herein, within the meaning of Rule 65(c), even if defendants are found to have been wrongfully enjoined or restrained; that

any possible costs or damages, if incurred, would be incurred in the course of the continuing duty of defendants to maintain law, order and public convenience in the City of Oakland concomitantly with the reasonable exercise by plaintiffs and others of their constitutional right of peaceful, orderly free speech, assembly and petition; that, in any event, the amount or sum of any such security, if required, would be a mere nominal sum or amount; that in the exercise of its discretion, the Court finds that in this case no sum or amount is proper. (See Urbain v. Knapp, 217 F.2d 810, 815 (8th Cir. 1954); See also, United States v. Onan, 190 F.2d 1 (8th Cir. 1951); Swift v. Black Panther Oil & Gas Co., 244 F. 20, 30 (8th Cir. 1917).

In accordance with said Findings of Fact and Conclusions of Law, a Preliminary Injunction will be issued this day by the Court. The Court incorporates by reference all of the provisions and conditions contained in said Preliminary Injunction and finds from the evidence that all conditions and provisions thereof are necessary and reasonable and in accordance with the law applicable to this case.

This Memorandum of Decision contains the Findings of Fact and Conclusions of Law as required by Fed.R.Civ.P. 52.

### APPENDIX A

#### THE OAKLAND MUNICIPAL CODE

Sec. 3–6.08 PARADE PERMITS. It shall be unlawful to institute, form or take part in any parade upon any public street in the City of Oakland, unless there exists a valid permit therefor, issued by the City Manager in compliance with the provisions of Article 2 of Chapter 5 of this Code.

The application for such permit shall set forth a full identification and explanation of the organization sponsoring the parade, the purpose of said parade, an estimation of the number of persons and vehicles which will take part in such parade, the desired time and route thereof. The Permit shall designate the route to be followed and the time of starting the parade, and shall be valid only as to such route and time. In addition to other grounds set forth in Article 2 of Chapter 5 of this Code the City Manager shall deny any application if in his opinion the proposed parade may result in conflict, violence or other disturbance of the public peace, or in serious traffic congestion. (As added by Ordinance No. 825 C.M.S., passed February 18, 1938).

Sec. 5–2.05 ACTION ON APPLICATION. The City Manager, or the investigating official acting thereon, shall deny the granting of any permit applied for if it shall appear to his satisfaction that the applicant is not a fit and proper person, either for financial, moral, or other reasons, to conduct or maintain the business, establishment, place, or other thing, to which the application appertains; that the applicant has not complied with the provisions of this Code which directly appertain to the maintenance or conduct of the business, establishment, place or other thing, in question or for the violation of any law appertaining thereto; or for any other reason hereinafter in this Chapter more specifically set forth.

In granting or denying such permit, and in specifying the conditions, if any, upon which it is granted, the City Manager or other official acting thereon, shall consider the character of the applicant as respects morality, honesty and integrity, and all pertinent acts which may concern the health, safety and general welfare of the public, and shall exercise a reasonable and sound discretion in the premises. The City Manager, or other official acting thereon, in acting upon an application for a permit, shall notify the investigating official to whom such application was referred, of such action.

### PRELIMINARY INJUNCTION

This cause came on to be heard for hearing on November 12, 1965, upon plaintiffs' application for a preliminary injunction, and upon the issuance of an order to show cause why injunctive re-

lief should not be granted as prayed in said petition.

The Court has determined that it has jurisdiction of the subject matter herein under the provisions of 62 Stat. 932 (1948), 28 U.S.C. Sec. 1343 (1964) and 17 Stat. 13 (1871), 42 U.S.C. Sec. 1983 (1964).

Upon consideration of the pleadings, affidavits and evidence of all parties, and all parties having been heard, and the cause having been regularly continued for further proceedings until November 17, 1965, and the Court having made Findings of Fact and Conclusions of Law as set forth in the Memorandum of Decision filed this date and pursuant thereto, it is:

Ordered, adjudged and decreed that defendants, John C. Houlihan, Mayor and Presiding Officer of the City Council of Oakland; Edward Toothman, Chief of Police, Oakland; John A. Morin, Acting City Manager, Oakland, together with their agents, employees, successors in office, and all persons subject to their orders, direction and control, and all persons acting in concert with them and all persons having notice of this Order are hereby enjoined and restrained:

(1) From arresting plaintiffs, or others similarly situated, for violation of the provisions of Sec. 3–6.08 or Sec. 5–2.05 of the Oakland Municipal Code, except as hereinafter provided, and from otherwise enforcing said provisions against plaintiffs and others similarly situated, so long as said plaintiffs, and others similarly situated, parade, march or walk for the purposes of exercising their rights of free speech, assembly and petition, as guaranteed by the First and Fourteenth Amendments of the United States Constitution in a peaceful, orderly manner on the 20th of November, 1965, during the daylight hours in the City of Oakland, from the point where Adeline Street and the Oakland City line intercept, along Adeline Street, across San Pablo Avenue and thence along Per-

alta Street to, and including, assembling in a vacant lot at 7th and Peralta Streets, hereinafter referred to as the "line of march"; *provided:*

(A) That the head of said parade of plaintiffs and others similarly situated commence entry into the City of Oakland not later than 11:-00 a. m., of said day;

(B) That the parade itself terminate not later than 4:00 p. m., of said day;

(C) That the assembly of plaintiffs and others similarly situated at 7th and Peralta Streets disperse in a peaceful and orderly manner not later than 5:00 p. m., of said day;

(D) That said parade enter the City of Oakland, and proceed along said line of march in sections, comprising not more than 1000 individual marchers in each section, with an interval between each section of at least 60 feet so as to permit both vehicle and pedestrian traffic to cross said line of march at reasonable periods of time, the supervision of same to be by defendants and their law enforcement officers;

(E) That said parade and all sections thereof to be further organized to proceed in a peaceful and orderly manner, with individual marchers not more than 7 abreast with ranks in reasonably close formation so as not to occupy more than one-half of the width of the street of said line of march and upon such side of the street at any given time as may be directed by defendants or their law enforcement officers;

(F) That, in the event that permission is not obtained for the use of the vacant lot at 7th and Peralta Streets for assembly purposes from the owner or government agency having the right of possession and control thereof, said

line of march shall be changed to permit plaintiffs and others similarly situated to march in the most direct manner along the public streets to either of the following locations: DeFremerery Park at 18th and Adeline Streets or Bushrod Park at Racine and 60th Streets; Provided further that named plaintiffs herein, give advance notice in writing to the Oakland City Manager no later than 5:00 p. m., on November 18, 1965, whether permission to use the 7th and Peralta Streets vacant lot has been granted, and, if permission has not been granted, which of the two alternative rally sites provided herein will be used to terminate the march and hold the rally;

(G) Robert Hurwitt has been designated by plaintiffs as Chairman of the November 20, 1965 parade and assembly and said Robert Hurwitt shall give written notice to the Oakland City Manager no later than 12:00 noon on November 19, 1965, of the name and address of the monitor for each section of the parade;

(H) That defendants herein have the supervision of said parade and assembly and the discretion to reasonably modify the details of said parade as enumerated in subparts (A) through (F) when in their reasonable belief modification is necessary to protect the rights of plaintiffs and others similarly situated or the rights of the public, provided such modification is made in good faith.

(2) From prohibiting or interfering with the parade and rally by plaintiffs and others similarly situated as presently scheduled and approved by this Court and more specifically, from prohibiting or interfering with the constitutional rights of plaintiffs and others similarly situated while parading, marching and assemblying on November 20, 1965,

during the parade and assembly as approved by this Court.

It is further ordered, adjudged and decreed that defendants, John C. Houlihan, Mayor and Presiding Officer of the City Council of Oakland; Edward Toothman, Chief of Police, Oakland; John A. Morin, Acting City Manager, Oakland, together with their agents, employees, successors in office and all persons subject to their orders, direction and control or acting in concert with them, are enjoined and restrained:

(1) From refusing or failing to provide adequate police supervision for the completion of said parade and assembly as presently approved by this Court;

(2) And from refusing or failing to take all reasonable precautions and means to protect plaintiffs and others similarly situated from attack, acts of violence or interference involving law violations during the march, assembly and dispersal thereof as hereinbefore provided.

It is further hereby ordered, adjudged and decreed that an ancillary provision of this injunction against defendants and in aid and furtherance of the observance of its terms and conditions, that plaintiffs and all other persons similarly situated, together with their agents, employees and all persons subject to their orders, directions and control, and all persons acting in concert with them, and all other persons having notice of this Order, are hereby enjoined and restrained:

(1) From deviating from the terms and conditions of the parade and assembly as herein set forth, and from engaging in any parade or holding any assembly in Oakland on November 20, 1965, other than in accordance with the terms and conditions of this Order, and;

(2) More specifically, from proceeding as a group or as individuals acting in concert with plaintiffs to the Oakland Army Terminal on November 20, 1965.

Nothing herein is intended to prohibit, nor shall anything herein be construed to prohibit or interfere with or limit, the right of defendants, or law enforcement officers, from enforcing or making arrests for violation of law or from performing their duty to maintain law and order except that defendants shall not enforce Sec. 3–6.08 or Sec. 5–2.05 of the Oakland Municipal Code against plaintiffs and all other persons similarly situated, together with their agents, employees and all persons subject to their orders, directions and control, and all persons acting in concert with them when acting within the conditions of this Order.

Jurisdiction of all matters herein involved is hereby specifically reserved by this Court.