[Crim. No. 11026. In Bank. Dec. 11, 1967.]

In re FREDERICK A. HOFFMAN et al. on Habeas Corpus.

A. L. Wirin, Fred Okrand, Laurence R. Sperber and Michael Hannon for Petitioners.

Roger Arnebergh, City Attorney, Philip E. Grey, Assistant City Attorney, and Michael T. Sauer, Deputy City Attorney, for Respondent.

TRAYNOR, C. J.—Petitioners were convicted in the Los Angeles Municipal Court of violating a city ordinance[1] restricting the right to be in a railroad station. The Appellate

[1]Los Angeles Municipal Code section 421.11.1 provides: "It shall be unlawful for any person to loaf or loiter in any waiting room, lobby, or other portion of any railway station, electric railway station, airport, or bus depot or upon the grounds of any common carrier adjacent thereto, or to remain in any such station, airport, or depot or upon any such

Department of the Superior Court affirmed the convictions and refused to certify the case to the Court of Appeal. (Rule 62(a), Cal. Rules of Court.) Petitioners seek a writ of habeas corpus on the ground that the ordinance unconstitutionally abridges their right of free speech.

Union Station in Los Angeles is owned by three railroad companies, the Southern Pacific, the Union Pacific, and the Santa Fe. It is a spacious area open to the community as a center for rail transportation. It also houses a restaurant, a snack bar, a cocktail lounge, and a magazine stand. Not only passengers but friends and relatives of passengers may freely enter and use the facilities of the waiting room. Entry is also free to those who seek food or drink or magazines and newspapers. There are signs posted around the station stating: "PRIVATE PROPERTY—PERMISSION TO PASS OVER REVOCABLE AT ANY TIME."

About 5 o'clock in the afternoon of September 5, 1966, a group of about 15 persons, including petitioners, entered the station to distribute leaflets protesting United States action in Vietnam and the impending court martial of three soldiers at Fort Hood, Texas, who had refused to go to Vietnam. They hoped to communicate with soldiers who would be in the station on their return to Camp Pendleton after the Labor Day weekend. They went to the station solely to distribute leaflets and discuss their position with persons in the area. They circulated about the main entrance, the lobby, and the south patio of the station. The city concedes that they did not impede the flow of traffic to or from the station or interfere with the purchase or sale of tickets or the conduct of business by the restaurant, bar, or magazine and newspaper stand located on the premises. Although their leaflets littered the floors and seats of the lobby, the littering was by those to whom the leaflets were given.

Officer Bakken, a special officer at Union Station, observed

grounds for a period of time longer than reasonably necessary to transact such business as such person may have to transact with any common carrier using or occupying such station, airport, or depot, provided, however, that nothing in this section will be deemed to prohibit any person occupying such station, airport or depot or grounds adjacent thereto for the bona fide purpose of meeting relatives or acquaintances arriving upon any conveyance entering such place, or from accompanying or meeting relatives or acquaintances who are departing from such station, airport, or depot upon any public conveyance operating therefrom, and provided further that nothing in this section shall be deemed to apply to any part of said station, airport, depot or grounds let for use as a restaurant or occupied by any other business not that of a common carrier."

petitioners' activities and stopped them outside the station master's office in the south patio. After learning that they had no business with the railroad, he informed them that they were on private property engaged in activities prohibited by station rules. On two occasions Officer Bakken told petitioners that they would have to leave if they did not stop distributing leaflets and talking to people. He had similar conversations with other members of the group. All refused to leave, and Los Angeles police officers summoned by Officer Bakken arrested them. The trial court acquitted six of them,[2] and found petitioners guilty on the ground that they were in the station without any business with a carrier and hence were loitering within the meaning of the ordinance.

The ordinance defines the law of trespass applicable to this situation. Trespass laws punish presence on property unauthorized by the possessor thereof and conclusively presume injury from that presence. [See fn. 3] The city's contention is essentially that the railroads have consented to open their property to the general public for a limited and specific purpose only, namely, for the use of the transportation facilities offered, that petitioners admittedly came onto the property for other purposes, and that the railroads may therefore demand their removal and arrest and prosecution for trespass.[3]

The theory advanced by the city has been unsuccessfully

---

[2]Eight of the group were charged in two consolidated actions. Four were acquitted on the ground that they occupied parts of the station excluded by the second proviso of the ordinance and two on the ground that there was no evidence to connect them with any violation of the ordinance.

[3]There are two entities having an interest in this facility. The railroads have a proprietary interest in protecting their right to use the property for its primary purpose. The municipality has a governmental interest in preserving its right to protect public health, safety, and order. Were it not for the claim of specific constitutional protection for First Amendment activities, either rationale would suffice to justify excluding petitioners from the station. Conduct not entitled to First Amendment protection and therefore receiving only the protection afforded by the due process and equal protection clauses may be regulated or prohibited by statutes covering more than that necessary to protect such public or private interests. Nor will the regulation be held invalid on the ground that its purpose could be as effectively achieved by alternative means that do not curtail the activity in question. (See, e.g., *United States* v. *Carolene Products Co.* (1938) 304 U.S. 144, 152-153 [82 L.Ed. 1234, 1241-1242, 58 S.Ct. 778]; compare, *ibid.*, fn. 4, at pp. 152-153.)

Activities that have the specific constitutional protection of the First Amendment, however, cannot be abridged or regulated unless the regulation is necessary, considering available alternatives, to protect other interests. Under this test, overly broad regulations must fall. (See, e.g., *Elfbrandt* v. *Russell* (1966) 384 U.S. 11 [16 L.Ed.2d 321, 86 S.Ct. 1238].)

urged to justify prohibition of First Amendment activities in the public streets and parks. The city seeks to distinguish streets and parks on the ground that "From time immemorial, streets, sidewalks and parks have been held in trust for the use of the public and have been used for purposes of assembly, communicating thoughts and discussing public questions." (Paraphrasing *Hague* v. *C.I.O.* (1939) 307 U.S. 496, 515 [83 L.Ed. 1423, 1436, 59 S.Ct. 954].)

At one time it was thought that a municipality could prohibit First Amendment activities in streets and parks on the ground that they constituted an unauthorized use of such facilities. (*Davis* v. *Massachusetts* (1897) 167 U.S. 43 [42 L.Ed. 71, 17 S.Ct. 731].) The "time immemorial" from which the streets and parks have been required to be held open for First Amendment activities dates from 1939, when *Hague* v. *C.I.O., supra,* was decided.[4] In a series of cases following *Hague* v. *C.I.O.,* the Supreme Court determined that a regulation of First Amendment activities in streets and parks must be supported by a valid municipal interest that cannot be protected by different or more narrow means. Such activities can be regulated only to the extent necessary to prevent interference with the municipality's interest in protecting the public health, safety, or order or in assuring the efficient and orderly use of streets and parks for their primary purposes. (See, e.g., *Cox* v. *Louisiana* (1965) 379 U.S. 536, 554-555 [13 L.Ed.2d '471, 483-484, 85 S.Ct. 453] ; *Lovell* v. *City of Griffin* (1938) 303 U.S. 444 [82 L.Ed. 949, 58 S.Ct. 666] ; *Cantwell* v. *Connecticut* (1940) 310 U.S. 296 [84 L.Ed. 1213, 60 S.Ct. 900, 128 A.L.R. 1352] ; *Largent* v. *Texas* (1943) 318 U.S. 418 [87 L.Ed. 873, 63 S.Ct. 667] ; *Staub* v. *City of Baxley* (1958) 355 U.S. 313 [2 L.Ed.2d 302, 78 S.Ct. 277] ; *Schneider* v. *State* (1939) 308 U.S. 147 [84 L.Ed. 155, 60 S.Ct. 146] ; *Jamison* v. *Texas* (1943) 318 U.S. 413 [87 L.Ed. 869, 63 S.Ct. 669] ; *Niemotko* v. *Maryland* (1950) 340 U.S. 268 [95 L.Ed. 267, 71 S.Ct. 325] ; compare, e.g., *Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568 [86 L.Ed. 1031, 62 S.Ct 766] with *Cantwell* v. *Connecticut, supra,* and *Kunz* v. *New York* (1951) 340 U.S. 290 [95 L.Ed. 267, 280, 71 S.Ct. 312, 328] ; *Feiner* v. *New York* (1951) 340 U.S. 315 [95 L.Ed. 267, 295, 71 S.Ct. 303, 328] with *Cox* v. *Louisiana, supra; Kovacs*

---

[4]Although the *Hague* case attempted to distinguish the *Davis* case (*Hague* v. *C.I.O., supra,* at p. 515 [83 L.Ed. at p. 1436]), it actually overruled it (*Jamison* v. *Texas* (1943) 318 U.S. 413, 415-416 [87 L.Ed. 869, 872-873, 63 S.Ct. 669]).

v. *Cooper* (1949) 336 U.S. 77 [93 L.Ed. 513, 69 S.Ct. 448, 10 A.L.R.2d 608] with *Saia* v. *New York* (1948) 334 U.S. 558 [92 L.Ed. 1574, 68 S.Ct. 1148] and *Wollam* v. *City of Palm Springs* (1963) 59 Cal.2d 276 [29 Cal.Rptr. 1, 379 P.2d 481]. See, generally, *Niemotko* v. *Maryland, supra,* 340 U.S. 268, 275-283 [95 L.Ed. 267, 272-276, 71 S.Ct. 325].) This rule applies whether the owner of the street is a governmental body or a private one. (*Tucker* v. *Texas* (1946) 326 U.S. 517, 524 [90 L.Ed. 274, 280, 66 S.Ct. 274]; *Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276].) ■ If the state curtails First Amendment freedoms to protect an interest that is nonexistent, whether claimed on behalf of the government or on behalf of a private individual, it violates the First and Fourteenth Amendments. (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 265 [11 L.Ed.2d 686, 697, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *Marsh* v. *Alabama, supra; Tucker* v. *Texas, supra.*)

■ The primary uses of municipal property can be amply protected by ordinances that prohibit activities that interfere with those uses. Similarly, the primary uses of railway stations can be amply protected by ordinances prohibiting activities that interfere with those uses. In neither case can First Amendment activities be prohibited solely because the property involved is not maintained primarily as a forum for such activities.

In *Brown* v. *Louisiana* (1966) 383 U.S. 131 [15 L.Ed.2d 637, 86 S.Ct. 719] the defendants were Negroes who had entered the local segregated public library, asked for a book and were told the library did not have it. The librarian and a police officer then requested the defendants to leave but they refused to do so. No one else was in the library at the time. The defendants were not disorderly, but neither were they using the library facilities for their intended purpose. The act of sitting in the library was a protest against the library's policy of segregation. The defendants were not noisy and did not interfere with the functioning of the library.

The majority of the Supreme Court reversed a conviction for breach of the peace on the ground that since there was no evidence of any disorder or disturbance that interfered with the use of the library for its intended purpose, the officer and the librarian had no right to request the defendants to leave. Accordingly, the defendants' refusal to leave could not constitutionally be punished as a breach of the peace.

According to the dissenters, however, to constitute a breach

of the peace, the activity in question did not have to interfere with the peace, order, or safety of the public or with the primary use of the library facility. In their view, the state could treat any unauthorized use of property maintained to perform a specific function as a breach of the peace. The majority's test was whether the defendants' conduct interfered with the use of the library; the minority's test was whether that conduct was a library use.

Similarly in the present case, the test is not whether petitioners' use of the station was a railway use but whether it interfered with that use. No interest of the city in the functioning of the station as a transportation terminal was infringed. Petitioners' conduct was also unassailable under statutes aimed at protecting the city's interest in preserving good order, cleanliness, public health, and safety. Nor did their presence violate any legitimate interest of the railroads, their patrons, or employees. It invaded no right of privacy. (Cf. *Public Utilities Com.* v. *Pollak* (1952) 343 U.S. 451 [96 L.Ed. 1068, 72 S.Ct. 813].) In this respect, a railway station is like a public street or park. Noise and commotion are characteristic of the normal operation of a railway station. The railroads seek neither privacy within nor exclusive possession of their station. They therefore cannot invoke the law of trespass against petitioners to protect those interests.

Nor was there any other interest that would justify prohibiting petitioners' activities. Those activities in no way interfered with the use of the station. They did not impede the movement of passengers or trains, distract or interfere with the railroad employees' conduct of their business, block access to ticket windows, transportation facilities or other business legitimately on the premises. Petitioners were not noisy, they created no disturbance, and did not harass patrons who did not wish to hear what they had to say.[5]

---

[5]The only evidence in the record regarding petitioners' conduct toward the patrons indicated that petitioners' behavior in no way amounted to harassment or pestering. According to the testimony of Officer Bakken, one woman "stated she had been sitting on this side but one man gave her some literature and another started to talk to her so she moved from here over to this side. And as I approached—the men followed her over—but as I approached, the two went out the south patio. Who they were I do not know." Officer Bakken also testified that petitioners were talking to two sailors and he "walked up and asked the sailors if they were being disturbed. And this one winked at me and shook his head." The fact that some people did not like petitioners' ideas does not mean that the way they communicated those ideas was disorderly. (See, e.g., *Cox* v. *Louisiana, supra*, at pp. 551-552 [13 L.Ed.2d at pp. 482-483]; *Brown* v. *Louisiana, supra; Cantwell* v. *Connecticut, supra*.)

Had petitioners in any way interfered with the conduct of the railroad business, they could legitimately have been asked to leave. (Cf. *Adderley* v. *Florida* (1966) 385 U.S. 39 [17 L.Ed.2d 149, 87 S.Ct. 242]; *People* v. *Brown* (1965) 236 Cal.App.2d Supp. 915 [47 Cal.Rptr. 662]; *People* v. *Poe* (1965) 236 Cal.App.2d Supp. 928 [47 Cal.Rptr. 670]; *People* v. *Green* (1965) 234 Cal.App.2d Supp. 871 [44 Cal.Rptr. 438].[6]) Similarly, had petitioners' acitivities conflicted with any valid municipal interest, the municipality could have proceeded against them.[7]

The ordinance is composed primarily of two parts. The first prohibits "loafing or loitering" in a terminal; the second prohibits remaining in a terminal longer than necessary to transact business. The obvious purpose of the second part is, as the city points out, to prevent "chaos, confusion, congested waiting rooms and littered lobbies [that] would replace the orderly business conducted in the Union Station." There are ways to prevent these evils and preserve the primary purpose of terminals, however, without forbidding the exercise of First Amendment freedoms within them. (Cf. *Wollam* v. *City of Palm Springs, supra,* at pp. 285-286.) Littering is subject to effective control by means less drastic (*Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247]) than forbidding the distribution of leaflets altogether (*Schneider* v. *State, supra,* at p. 162 [84 L.Ed. at p. 165]). Congestion can be avoided by controls on activities

---

[6]Of course, the degree of interference with business operations need not reach the level attained by the defendants in the "bank-in" cases (*People* v. *Brown, supra*; *People* v. *Green, supra*; *People* v. *Poe, supra*) before a proprietor may demand their removal. As stated above, any appreciable interference with the orderly carrying on of business may suffice. A bank may well have security problems akin to those of a jail, that permit it altogether to prohibit First Amendment activities inside its premises. (Cf. *Adderley* v. *Florida, supra.*) Some interference, however, must be shown. (Cf. *Thomas* v. *Collins* (1944) 323 U.S. 516, 531 [89 L.Ed. 430, 440, 65 S.Ct. 315].)

[7]It is immaterial that another forum, equally effective, may have been available to petitioners. As stated in *Schneider* v. *State, supra,* 308 U.S. 147, 163 [84 L.Ed. 155, 165]: "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." Absent the presence of some conflicting interest that could be protected in no other way, petitioners have the right to choose their own forum. Since there is no competing interest present in this case, there is no need to balance, and we need not review those instances where the narrowness of the issue restricts the appropriate audience, creating a compelling need for a particular forum that may be upheld against a very slight competing interest. (Cf. *Schwartz-Torrance Inv. Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921].)

during peak hours. (See, e.g., *Cottonreader* v. *Johnson* (1966) 252 F.Supp. 492, 500; *Hurwitt* v. *City of Oakland* (1965) 247 F.Supp. 995; cf. *Edwards* v. *South Carolina* (1963) 372 U.S. 229, 236 [9 L.Ed.2d 697, 702, 83 S.Ct. 680].) Reasonable and objective limitations can be placed on the number of persons who can be present for First Amendment activities at the same time, and the persons present can be required so to place themselves as to limit disruption. (See, e.g., *Hurwitt* v. *City of Oakland, supra.*) In areas normally subject to congestion, such as ticket windows and turnstiles, First Amendment activities can be prohibited. (Cf. *Adderley* v. *Florida, supra*; *People* v. *Brown, supra*; *People* v. *Poe, supra*; *People* v. *Green, supra.*) Persons can be excluded entirely from areas where their presence would threaten personal danger or block the flow of passenger or carrier traffic, such as doorways and loading areas. (Cf. *Adderley* v. *Florida, supra*; *People* v. *Brown, supra*; *People* v. *Green, supra.*)

In short, the second part of the ordinance completely prohibits protected activities although a narrower measure would fully achieve the intended ends and at the same time preserve an effective place for the dissemination of ideas. Because of the overbreadth of coverage in this ordinance, the language prohibiting presence in a terminal longer than reasonably necessary to conduct business with a carrier is unconstitutional.[8] (Cf. *Elfbrandt* v. *Russell* (1966) 384 U.S. 11 [16 L.Ed.2d 321, 86 S.Ct. 1238].)

The first part of the ordinance forbids anyone to "loaf or loiter" about a terminal. For the reasons expressed in *In re Cregler* (1961) 56 Cal.2d 308, 312 [14 Cal.Rptr. 289, 363 P.2d 305], we construe the phrase "loaf or loiter" to bear a "sinister or wrongful" implication. As so interpreted the first part of the ordinance is a justified police measure that protects the city's interest in assuring public safety (cf. *Gleason* v. *Municipal Court* (1964) 226 Cal.App.2d 584, 587 [38 Cal.Rptr. 226]) without interfering with the legitimate exercise of any constitutionally protected activity.

Striking the part of the ordinance that we have held to be unconstitutional does not "vitiate the whole act." (*Danskin* v. *San Diego Unified School Dist.* (1946) 28 Cal.2d 536,

---

[8]The specific language we refer to is: ". . . or to remain in any such station, airport, or depot or upon any such grounds for a period of time longer than reasonably necessary to transact such business as such person may have to transact with any common carrier using or occupying such station, airport, or depot. . . ."

555 [171 P.2d 885], quoting from *People v. Lewis* (1939) 13 Cal.2d 280, 284 [82 P.2d 388].) Accordingly, all but the particular language we have indicated may stand.

 The trial court applied the *Cregler* definition of "loiter" and found that petitioners violated the first part of the ordinance. The record clearly indicates that the court reached this conclusion by finding that petitioners violated the second part of the ordinance and then reasoning that they were therefore present without any "lawful purpose." Since the second part of the ordinance is broader than constitutionally permissible, petitioners' convictions cannot stand under any theory, for there is no other evidence that they were present in Union Station for an "unlawful" purpose.

The writ is granted and the petitioners are discharged from custody.

Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

BURKE, J., Dissenting.

In my view the city ordinance provision in question is entirely reasonable and constitutes a necessary and proper exercise of the police power of a city.[1]

It seeks to prevent occurrences in highly volatile, sensitive areas of public terminals by preventing unnecessary loitering or remaining in such terminals by persons who have no legitimate business being there.

It should not be necessary to await a disturbance, interference, riot, theft, pickpocketing, baggage snatching, blocking passage, soliciting for improper purposes or interference with the business of the common carriers involved, before a valid municipal interest arises to warrant the enactment or enforcement of the ordinance here involved.[2]

Airports, railway stations, and bus depots — and their patrons—are faced with problems peculiar to themselves and not common to those of public streets, parks, playgrounds, libraries, museums, zoos, theaters, auditoriums, or public restrooms. As one reflects upon each of the kinds of places mentioned one realizes that each has its sensitive areas and

---

[1] California Constitution, article XI, section 11.

[2] I.e., the portion of the ordinance which makes it unlawful to remain in any railway station, airport, or bus depot or the grounds for longer than reasonably necessary to transact business with any common carrier using or occupying such station, airport, or depot.

requires a body of law to protect the interests of all who are involved in utilizing such places. Such regulations evolve, as here, over a long period of time and not all reasons for them are as readily apparent as here. The determination of the need for such regulations has been entrusted by law to the appropriate governing boards, and their legislative acts are entitled to be upheld by the courts unless shown to be arbitrary, capricious, or contrary to law. There is no semblance of such a showing here.

Mass transportation terminals are designed to serve the convenience and interest of the traveling public and require the handling of large numbers of persons and baggage. Crowds of friends or relatives meeting passengers or seeing them off add to the mass of people frequenting terminals. Problems of lost luggage and lost persons, including the very elderly, the very young, the halt, lame and blind, are frequent. The mere presence of Travelers Aid desks in common carrier terminals, to lend assistance to those needing it, is indicative that such stations are places where confusion and distractions abound. Often last minute connections must be attempted or undue delays endured. The common good demands that unnecessary interferences with the operation of such terminals be eliminated. That is the proper public purpose sought to be served by the city ordinance in question.

It is a matter of common knowledge, which police records confirm, that amid the confusion incident to arrivals and departures, luggage and purses are vulnerable to being snatched and pickpockets can and do operate profitably.

Airports, bus depots, and railroad stations are places of escape, of rapid ingress and egress from metropolitan areas, and are often required to be placed under surveillance by federal, state and local police agencies. Other government agencies such as customs officers, agricultural inspectors, narcotic law enforcement officers, and health and quarantine officials are often on duty in such terminals.

Furthermore, it is common knowledge that persons frequenting stations, depots and airports are often under heavy emotional stress, being parted from, or united with loved ones; they are preoccupied with last minute personal communications and deserve what little privacy may be left to them. In some terminals many would-be passengers are waiting on a standby basis, particularly armed forces personnel, not knowing from one minute to the next whether they will be

leaving or staying. In such situations emotions run high, nerves are taut and conditions are volatile.

Terminals are normally surrounded by broad public sidewalk areas readily available for the exercise of First Amendment rights, the distribution of handbills and like activities. Travelers gain access to the premises or leave by such sidewalks. It does not appear to constitute an unreasonable interference with First Amendment rights to require that persons desiring to exercise such rights withdraw to the public sidewalk areas to contact travelers for their purposes.

The municipal regulation here involved should be upheld as a valid and reasonable approach to the maintenance of law and order and the protection of the traveling public, and not to constitute an undue interference with the exercise of First Amendment rights.

I would deny the writ.

McComb, J., concurred.