[Civ. No. 54671. First Dist., Div. Two. Apr. 15, 1985.]

PITTSBURG UNIFIED SCHOOL DISTRICT et al.,
Plaintiffs and Respondents, v.
CALIFORNIA SCHOOL EMPLOYEES ASSOCIATION et al.,
Defendants and Appellants.

878

880

COUNSEL

Peter A. Janiak, Madalyn J. Frazzini, Siona D. Windsor, Maureen C. Whelan, E. Luis Saenz, Janae H. Novotny, Marcia L. Meyers, Marci B. Seville, William C. Heath and Harry J. Gibbons, Jr., for Defendants and Appellants.

Kirsten L. Zerger, Raymond L. Hansen, Diane Ross, Ramon E. Romero, Margaret C. Crosby, Alan L. Schlosser and Amitai Schwartz as Amici Curiae on behalf of Defendants and Appellants.

Keith V. Breon, Martha Buell Scott and Breon, Galgani, Godino & O'Donnell for Plaintiffs and Respondents.

OPINION

**KLINE, P. J.**—The chief issue in this case is whether certain concerted activities of school employees involved in a labor dispute with a school

district constitute a corrupt practice or are otherwise unlawful and may therefore be restricted without infringing First Amendment rights.

Appellants, California School Employees Association, and local CSEA Chapter 44[1] (hereinafter collectively referred to as CSEA) and various individual officers, members and employees of CSEA, appeal the issuance of a preliminary injunction prohibiting them, and others acting in concert with them, from picketing and leafletting outside the personal business offices of certain governing board members of the Pittsburg Unified School District (hereinafter District). They contend that the injunction violates their constitutional rights under the First Amendment and thus seek reversal of the preliminary injunction, dismissal of the underlying complaint for declaratory relief and damages, and the award of court costs.

### Statement of the Case/Facts

During 1980, CSEA and the District conducted negotiations concerning the reopening of a collective bargaining agreement. On November 17, 1980, after 12 negotiating sessions, the District and CSEA jointly declared that they were at an impasse. Thereafter, a mediator was appointed by the Public Employment Relations Board (PERB). Mediation sessions were held during February and March 1981. Shortly before these sessions commenced, local officers of CSEA 44 began sending letters to members informing them of the status of their dispute with the District and calling for membership support, attendance at meetings of the board of governors of the District, and, in the event these efforts failed, employee action.

On March 26, 27 and 30, for approximately one hour each day, four or five CSEA members carrying placards and distributing leaflets stationed themselves on the sidewalk in front of the private business offices of respondent governing board members Nancy Parent, an attorney, and Marlene Cacciola, a tax accountant. Said respondents' offices, which were adjacent to one another, were located in a commercial center on Railroad Avenue, a major thoroughfare of the City of Pittsburg. Many of the placards carried

---

[1] CSEA is an employee organization representing in excess of 140,000 California classified school employees. Classified school employees are generally nonteaching school employees, such as custodians, bus drivers, secretaries, instructional aides and food service workers. (See Ed. Code, §§ 45103, 45104.) Chapter 44 is the local chapter of CSEA for classified school employees of the Pittsburg Unified School District. CSEA and its Chapter 44 is the exclusive representative of a bargaining unit of respondent school district's classified employees pursuant to the Education Employment Relations Act found in Government Code sections 3540 et seq.

by the picketers described their activity as a "Public Information Picket."[2] In declarations presented to the trial court, officers of CSEA and members involved in the picketing asserted that picketers did not block ingress or egress from the buildings and that no one was otherwise discouraged from entering respondents' business premises or from doing business with them.

On March 30, 1981, the third day of the picketing, the District filed a complaint and supporting declarations with the Contra Costa County Superior Court seeking injunctive relief and damages against appellants. The District sought to enjoin appellants from picketing outside the business offices and residences of the governing board members, as well as one million dollars in punitive damages. Concurrently, the District applied for a temporary restraining order and an order to show cause regarding preliminary injunction. On March 31, 1981, Judge David A. Dolgin issued a Memorandum Decision and Temporary Restraining Order prohibiting appellants from picketing at the "private offices, businesses or places of employment" or "private residences" of members of the District's governing board.[3] A hearing was held before Judge Dolgin on the request for a preliminary injunction on April 14, 1981. A Memorandum of Decision issued the following day denying the request for injunctive relief and dissolving the temporary restraining order "on the sole ground that the school district itself is not a proper party to enforce the personal rights of individual Board members."

On April 15, 1981, after the temporary restraining order was dissolved, the attorney for appellants telephoned various CSEA members to inform them of the order dissolving the restraining order and advised that CSEA

[2]According to the declaration of board member Parent, one placard read "Picket Today Strike Tomorrow." Another read "A Fair Contract Now—CSEA" and on the other side, "Public Information Picket." A third read, "I Do Not Want To Strike But I Will" on one side and on the other, "A Fair Contract Now—CSEA." Leaflets were also distributed during the picketing. These leaflets called upon readers to call board members named therein to let board members know the public's feelings concerning a fair contract.

In her declaration Nancy Parent states that she saw appellants carrying a sign that read, "Board Member Parent Is Unfair" and "Board Member Cacciola Is Unfair." The declaration of picketer Laura Michaelis states that on the other side of each of these signs was written "Public Information Picket."

[3]Although it may at one time have been considered, residential picketing did not occur. Nothing in this opinion should therefore be construed to suggest that the state may not restrict activity that invades the tranquility of the home or "public and other buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools and hospitals." (*Gregory* v. *Chicago* (1969) 394 U.S. 111, 118 [22 L.Ed.2d 134, 140, 89 S.Ct. 946] (conc. opn. of Black, J.).) On this issue see generally *Payton* v. *New York* (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct. 1371]; *Stanley* v. *Georgia* (1969) 394 U.S. 557 [22 L.Ed.2d 542, 89 S.Ct. 1243]; *Annenberg* v. *Southern Cal. Dist. Council of Laborers* (1974) 38 Cal.App.3d 637 [113 Cal.Rptr. 519].

should limit its activity to leafletting. Accepting this advice, *no more than* seven CSEA members returned to the public sidewalks on April 15, 16 and 17 without placards for the sole purpose of leafletting. The single type of leaflet utilized, which was assertedly handed only to passers-by who indicated interest, identified the occupations represented by CSEA and asked for the public's help in obtaining what it termed a fair contract. The public was urged to call board members whose names were listed on the leaflet.

In the words of one of the officers of CSEA, the purpose of the leafletting was "[t]o draw attention from the public to the fact that these are Board members and [that] they can be contacted." Appellants did not leaflet outside the other members' offices because one worked outside of Pittsburg, where the people in that area "would not be the voting electorate for the Pittsburg Unified Board members and they would not be able to support [CSEA] views on the contract"; another member was retired; and appellants were not certain where the fifth member was employed.

On April 17, 1981, the District amended its complaint to include the five governing board members, individually and in their official positions, and sought another temporary restraining order. On the same day, appellants filed a declaration of prejudice against Judge Dolgin pursuant to Code of Civil Procedure section 170.6, whereupon Judge Dolgin declared himself disqualified. The case was transferred to Judge Richard Arnason, who refused to issue a temporary restraining order and set the preliminary injunction request for hearing on an order to show cause. Respondents sought a petition for extraordinary relief from this court on April 22, 1981, which was denied as premature.

Consistent with an interim agreement signed by the parties on April 23, CSEA ceased its leafletting activity to facilitate a negotiating session that took place on April 28. That negotiating session resulted in the agreement by CSEA that further concerted activity would cease until negotiations were concluded. In return, the District agreed not to seek a hearing on the preliminary injunction during this period. At a final negotiating session on May 11 the parties jointly concluded that the factfinding procedures of Government Code section 3548.1 should be invoked. CSEA agreed to refrain from concerted activity for a reasonable time in order to allow the parties to prepare for the hearing on the preliminary injunction but did not agree to refrain from that activity for the duration of the factfinding process.

On May 18, 1981, after an earlier consolidated hearing on both respondents' request for preliminary injunction and appellants' demurrer to the amended complaint, Judge Robert J. Cooney issued a memorandum decision

overruling the demurrer, providing appellants 20 days within which to answer, and granting the preliminary injunction substantially as prayed for.[4] An order consistent with this decision was issued on June 11, 1981.[5] Thereafter appellants filed a timely answer to the complaint and a motion to reconsider, which was denied. This appeal followed.

## I

Before reaching the merits, we first confront the thorny question of the trial court's jurisdiction. ■ Appellants, amicus California Teachers Association (CTA) and PERB contend that the trial court lacked jurisdiction to enjoin appellants' activity as PERB had initial exclusive jurisdiction to determine whether the leafletting was an unfair practice under the Educational Employment Relations Act (EERA) (Gov. Code, § 3540 et seq.)[6] and, if so, to fashion the appropriate remedy.

■ In *El Rancho Unified School Dist.* v. *National Education Assn.* (1983) 33 Cal.3d 946 [192 Cal.Rptr. 123, 663 P.2d 893], the Supreme Court reemphasized the conclusion reached in *San Diego Teachers Assn.* v. *Superior Court* (1979) 24 Cal.3d 1 [154 Cal.Rptr. 893, 593 P.2d 838], "that the principles defining the preemptive reach of the NLRA [National Labor

---

[4]In a separate memorandum filed on May 26, Judge Cooney found that appellants' activity on April 16 and 17 "constitutes picketing." However, on July 2, 1981, Judge Cooney issued an order striking this finding, leaving no findings of fact in this matter.

[5]The operative provisions of this order are as follows: "1. IT IS HEREBY ORDERED that a preliminary injunction shall issue, enjoining Defendants, and each of them, and their agents, employees, representatives, officers, organizers, committee persons, and members, and all corporations, unincorporated associations and natural persons acting in active concert and participation with any of them from establishing, continuing, or maintaining, or assisting, sanctioning, causing, aiding, encouraging or abetting the establishing, continuing or maintaining of pickets at the offices, businesses or places of employment of members of the Board of Education.

"2. IT IS FURTHER ORDERED that Defendants, and each of them, and their agents, employees, representatives, officers, organizers, committee persons, and members and all corporations, unincorporated associations and natural persons acting in concert with them are hereby enjoined and restrained from doing or attempting to do, directly, or indirectly, by any means, method or device whatsoever, including but not limited to leafleting, any of the acts enjoined in Paragraph 1 hereof during the pendency of this action.

"3. This Order shall not prohibit informational picketing off the premises of any school or other site of the Pittsburg District schools for the purposes of communicating grievances of any employees of the Pittsburg Unified School District to mobilize employee or public support provided they do not interfere with ingress or egress."

[6]"Enacted by the Legislature in 1975, EERA [Gov. Code, §§ 3540-3549.3] grants to public school employees the right to meet and negotiate with the public school employer through an exclusive representative. To supervise the selection of the exclusive representatives and to determine charges of 'unfair practices' or 'alleged violations of this chapter' (Gov. Code, §§ 3541-3541.5) is granted to PERB." (*Leek* v. *Washington Unified School Dist.* (1981) 124 Cal.App.3d 43, 46, fn. 1 [177 Cal.Rptr. 196].)

Relations Act] are generally applicable in determining the scope of PERB's preemptive jurisdiction under EERA. (24 Cal.3d at p. 12; accord *Public Employment Relations Bd.* v. *Modesto City Schools Dist.* (1982) 136 Cal.App.3d 881, 890-891 . . . .)" (*Id.,* at p. 953, fn. omitted.) Embracing the NLRA model, *El Rancho·*concluded that PERB has exclusive jurisdiction over activities "arguably protected or prohibited" by the EERA.

Under the federal model, state courts have been allowed to enforce certain laws of general applicability even though aspects of the challenged conduct were arguably protected or prohibited by the NLRA. "Thus, for example, the Court has upheld state-court jurisdiction over conduct that touches 'interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.' [Citations.]" (*Sears, Roebuck & Co.* v. *Carpenters* (1978) 436 U.S. 180, 195 [56 L.Ed.2d 209, 224, 98 S.Ct. 1745].) This "local concern exception" rests in part upon principles of federalism but also upon a recognition that, in certain areas, decisions of local courts do not present substantial danger of interference with administrative adjudication. (*Kaplan's Fruit & Produce Co.* v. *Superior Court* (1979) 26 Cal.3d 60, 75 [160 Cal.Rptr. 745, 603 P.2d 1341].)

Two factors are considered relevant to application of the local concern exception to the arguably prohibited branch of the preemption doctrine. First, does there exist a "significant state interest in protecting the citizen from the challenged conduct." Second, despite the occurrence of the challenged conduct in the course of a labor dispute and the possibility of filing an unfair labor charge, does the exercise of state jurisdiction over the tort claim entail little risk of interference with the regulatory jurisdiction of the administrative agency. (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. at p. 196 [56 L.Ed.2d at p. 224].) The Supreme Court in *Sears* summed up the "critical inquiry" as "whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been . . . presented to the Labor Board." (*Id.,* at p. 197 [56 L.Ed.2d at p. 225]; *El Rancho Unified School Dist., supra,* 33 Cal.3d at p. 956.) "For it is only in the former situation that a . . . court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch . . . was designed to avoid." (*Sears, supra,* at p. 197, fn. omitted [56 L.Ed.2d at pp. 225-226].)[7]

---

[7]The California Supreme Court in *El Rancho* adopted this test in determining that PERB had exclusive jurisdiction over the strike controversy. Having found the strike arguably prohibited, the court concluded that preemption was proper because the controversy presented in both forums—the legality of the strike—"may fairly be termed the same"—and because there was no disparity between public and PERB interests in maintaining the continuity and quality of educational services. (33 Cal.3d at p. 957.)

Again following the federal model, the *El Rancho* court recognized that somewhat different considerations apply when the question is whether the arguably protected character of the conduct in question provides a sufficient justification for preemption. The court acknowledged that the arguably protected branch of preemption doctrine would not apply where the employer could not invoke PERB jurisdiction. (*Ibid.*) "[T]he arguably protected branch of the preemption doctrine 'unquestionably requires that when the same controversy may be presented to the . . . court or the [Board], it must be presented to the Board. But [this rule] does not extend to cases in which an employer has no acceptable method of invoking, or inducing the Union to invoke, the jurisdiction of the Board,' unless there is 'a significant risk of misinterpretation of [the governing labor law] and the consequent prohibition of protected conduct.' (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. at pp. 202-203, see discussion at pp. 199-202 . . . .)" (33 Cal.3d at p. 959.)[8]

In this case, amicus CTA posits that the activity of CSEA at issue arguably violates subdivisions (c) and (d) of Government Code section 3543.6, as a failure to negotiate in good faith and a refusal to participate in impasse procedures. CTA additionally contends that the union's activity constitutes "organizational participation" arguably protected under section 3543.

■■■ We are not persuaded that the subject activity arguably constitutes unfair practices or other violations of EERA. Nor do we view the activity as "arguably protected" by the Act as that term has been interpreted in *El Rancho*. However, we need not decide these questions, as we believe that even if CSEA's activity is arguably protected or prohibited under the EERA, the "local concern" exception to preemption is clearly applicable. Without question, as will appear, all parties to this action conceive that the central issue presented to the trial court and on this appeal is whether appellants' conduct represents a corrupt practice within the meaning of Education Code section 35230 or unlawfully places respondent board members in a conflict of interest of the sort proscribed by Government Code section 1090.[9] On these grounds respondents maintain that the conduct may be

---

[8]Drawing an analogy to NLRB cases holding assertedly unlawful strikes protected if in response to an employer unfair labor practice, the court held that arguable unfair labor practices of the employer school district rendered the strike arguably protected. The court held application of this branch justified in *El Rancho* because in that case there was a " 'potential overlap' between the controversy presented to the superior court . . . and the controversy that might have been presented to PERB. [Citation.]" (*Id.,* at p. 959.) As an unfair practice charge had originally been filed by the school district against the unions, the district could have obtained a PERB ruling on the unfair practice charge which would have addressed the issue whether the union conduct was protected. (*Ibid.*)

[9]Education Code section 35230 and Government Code section 1090 are respectively set forth, *post,* at pages 896-897 and page 900, footnote 18.

restricted without infringing appellants' First Amendment rights. The central legal and constitutional questions thus presented certainly are not within PERB jurisdiction.

Courts of appeal have held that where the conduct of a party is claimed to violate a duty imposed under the Education Code exhaustion of PERB remedies is not required. For example, in *California School Employees Assn. v. Travis Unified School Dist.* (1984) 156 Cal.App.3d 242 [202 Cal.Rptr. 699], it was recently held that PERB did not have initial exclusive jurisdiction where an employee association challenged the refusal of a school district to reimburse bus drivers for expenses incurred in transporting students to athletic events and on other field trips as required by Education Code section 44032. "Because section 44032 mandates districts to reimburse employees for expenses incurred in performing services for them," the court stated, "such entitlement to reimbursement is not subject to and thus not within PERB's exclusive initial jurisdiction." (*Id.,* at p. 250.) The obligation is fixed by statute and "exists independently of the collective bargaining agreement." (*Ibid.*) Similarly, in *California School Employees Assn. v. Azusa Unified School Dist.* (1984) 152 Cal.App.3d 580 [199 Cal.Rptr. 635], it was held that the question whether classified employees were entitled to be paid for local holidays pursuant to Education Code section 45203 is within the court's rather than PERB's jurisdiction. (*Id.,* at pp. 591-593.)

The local concern exception to preemption doctrine has been applied in cases involving the NLRA and the state Agricultural Labor Relations Act even where the union activity in question was arguably prohibited, and therefore may arguably be remedied, under the Act. (See, e.g., *Youngdahl v. Rainfair, Inc.* (1957) 355 U.S. 131 [2 L.Ed.2d 151, 78 S.Ct. 206]; *Auto Workers v. Wisconsin Board* (1956) 351 U.S. 266, 274 [100 L.Ed. 1162, 1172, 76 S.Ct. 794]; *Bertuccio v. Superior Court* (1981) 118 Cal.App.3d 363, 370 [173 Cal.Rptr. 411]; see also, *Kaplan's Fruit & Produce Co. v. Superior Court, supra,* 26 Cal.3d 60.) ■ The local concern exception is therefore consistent with the principles articulated in *San Diego Teachers Assn., supra,* 24 Cal.3d 1, and *El Rancho, supra,* 33 Cal.3d 946, that the jurisdiction of the superior court is not *necessarily* preempted simply because the activity in question may constitute an arguably prohibited activity under EERA and PERB may have jurisdiction to provide a remedy. The chief reason the jurisdiction of the superior court was held to be preempted in *San Diego Teachers Assn.* and *El Rancho* was because under the facts of those cases there was no disparity between the public and PERB interest at stake, which uniformly related to minimizing interruptions in educational

services. (*San Diego Teachers Assn., supra,* 24 Cal.3d at p. 11; *El Rancho Unified School Dist., supra,* 33 Cal.3d at p. 957.)

The same cannot be said with respect to the present case. As earlier indicated, the EERA does not address the issues of corrupt practices or conflicts of interests involving members of the governing board of a school district, which are not proper subjects of collective bargaining, and these issues are neither of jurisdictional interest to PERB nor within its areas of expertise. Such issues are, on the other hand, of obvious interest to the public and involve legal questions squarely within the jurisdiction and expertise of the courts.

Finally, the arguably protected branch of preemption doctrine does not apply here as individual members of the governing board of a school district have no means of invoking, or inducing CSEA to invoke, PERB jurisdiction. Government Code section 3541.5, subdivision (a), provides as pertinent that "[a]ny employee, employee organization, or employer shall have the right to file an unfair practice charge, . . ." Section 3540.1, subdivision (j) defines the terms "employee" as "any person employed by any public school employer except persons elected by popular vote, or persons appointed by the Governor of this state, management employees, and confidential employees." "Public school employer" or "employer" is defined in section 3540.1, subdivision (k), as "the governing board of a school district, a school district, a county board of education, or a county superintendent of schools." Respondents, who are individual board members seeking to vindicate private rights, do not come within these definitions. The law's exclusion of respondents from the categories of employees and employers entitled to claim an unfair labor practice demonstrates that the issues they raise in this litigation are not a significant concern of the EERA and reinforces our conclusion that there is no preemption.

For the foregoing reasons we conclude that PERB did not have initial exclusive jurisdiction in this case.

Thus we turn to the central question: whether, as respondents claim, appellants' activity violated state policy in an area subject to state regulation and may therefore be restricted or, as appellants insist, this activity was entirely lawful and protected.

## II

Because of its perception that free discussion concerning the issues involved in a labor dispute is often "indispensable to the

effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society" (*Thornhill* v. *Alabama* (1940) 310 U.S. 88, 103 [84 L.Ed. 1093, 1103, 60 S.Ct. 736]), the United States Supreme Court has more than once reiterated that "the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution."[10] (*Id.*, at p. 102 [84 L.Ed. at p. 1102], accord, *Thomas* v. *Collins* (1945) 323 U.S. 516, 532 [89 L.Ed. 430, 441, 65 S.Ct. 315]; *Cafeteria Union* v. *Angelos, supra,* 320 U.S. 293; *Bakery Drivers Local* v. *Wohl, supra,* 315 U.S. 769; *A. F. of L.* v. *Swing, supra,* 312 U.S. 321; *Senn* v. *Tile Layers Union* (1937) 301 U.S. 468, 478 [81 L.Ed. 1229, 1236, 57 S.Ct. 857].)

The right to inform the public on such issues is protected not only as part of free speech, but as part of free assembly. (*Thomas* v. *Collins, supra,* 323 U.S. at p. 532 [89 L.Ed. at p. 441]; *Hague* v. *C. I. O.* (1939) 307 U.S. 496 [83 L.Ed. 1423, 59 S.Ct. 954].) Furthermore, where the activity in question targets government officials, the right of petition is also placed in issue. (*Eastern R. Conf.* v. *Noerr Motors* (1961) 365 U.S. 127, 139-140 [5 L.Ed.2d 464, 472-473, 81 S.Ct. 523]; *Mine Workers* v. *Pennington* (1965) 381 U.S. 657, 669-670 [14 L.Ed.2d 626, 635-636, 85 S.Ct. 1585]; *California Transport* v. *Trucking Unlimited* (1972) 404 U.S. 508, 510 [30 L.Ed.2d 642, 646, 92 S.Ct. 609]; *Franchise Realty, Etc.* v. *S. F. Loc. Joint*

---

[10]Respondents argue that there was no "labor dispute" in effect between their private businesses and appellants. In *McKay* v. *Retail Auto. S. L. Union No. 1067* (1940) 16 Cal.2d 311 [106 P.2d 373] and *C. S. Smith Met. Market Co.* v. *Lyons* (1940) 16 Cal.2d 389 [106 P.2d 414], the union picketed nonunion employers for the legitimate purpose of securing a closed shop in those businesses. The courts refused to enjoin the activity even though the union did not represent employees of the businesses picketed. The term "labor dispute" was not used as the criterion for the decision of whether to enjoin the picketing where the employers were not involved in a dispute with their employees at the time of the pickets. Rather, the determinative issue was whether the union was demanding something which was *reasonably related to employment* and to the purposes of collective bargaining, and whether the attainment of their object would benefit them directly or would enhance their bargaining power. As the individual respondents herein are also members of the governing board of the school district, appellants' activity definitely fits the "legitimate basis" test of *McKay* and *C. S. Smith Met. Market Co.* There is a direct nexus between the dispute and the persons being leafletted. (Cf. *Carpenters Union* v. *Ritter's Cafe* (1942) 315 U.S. 722 [86 L.Ed. 1143, 62 S.Ct. 807], upholding a Texas statute which enjoined as a violation of its antitrust law picketing of a restaurant by unions to pressure its owner with respect to the use of nonunion labor by a contractor of the restaurant owner in construction work having nothing to do with the restaurant. The Supreme Court held that Texas could insulate from the dispute a neutral establishment that industrially had no connection with it as this type of picketing involved little, if any, "communication.") It seems generally to be agreed that a state cannot either by its common law or by statute prohibit the peaceful picketing of a place of business solely on the ground that the picketing is carried on by persons not employed therein. (*Cafeteria Union* v. *Angelos* (1943) 320 U.S. 293 [88 L.Ed. 58, 64 S.Ct. 126]; *Bakery Drivers Local* v. *Wohl* (1942) 315 U.S. 769 [86 L.Ed. 1178, 62 S.Ct. 816]; *A. F. of L.* v. *Swing* (1941) 312 U.S. 321 [85 L.Ed. 855, 61 S.Ct. 568]; *McKay* v. *Retail Auto. S. L. Union No. 1067, supra,* 16 Cal.2d 311.)

*Exec. Bd.* (9th Cir. 1976) 542 F.2d 1076, 1079-1081, cert. den., 430 U.S. 940 [51 L.Ed.2d 787, 97 S.Ct. 1571].)

When, as in the instant case, such rights have been restricted we must " 'make an independent examination of the whole record,' [citation], so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 285 [11 L.Ed.2d 686, 709, 84 S.Ct. 710, 95 A.L.R.2d 1412], quoted in *NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886, 916, fn. 50 [73 L.Ed.2d 1215, 1238, 102 S.Ct. 3409].) "It is imperative that, when the effective exercise of these rights is claimed to be abridged, the courts should 'weigh the circumstances' and 'appraise the substantiality of the reasons advanced' in support of the challenged regulations. [Citation.]" (*Thornhill* v. *Alabama, supra,* 310 U.S. 88, 96 [84 L.Ed. 1093, 1099].) For an injunction cannot be granted where the restraint interferes with protected First Amendment activity without a showing of a substantial public need for doing so. (See, e.g., *Thornhill* v. *Alabama, supra; In re Berry* (1968) 68 Cal.2d 137 [65 Cal.Rptr. 273, 436 P.2d 273]; *McKay* v. *Retail Auto. S. L. Union No. 1067, supra,* 16 Cal.2d 311.)[11] In light of the judiciary's "zealous solicitude for rights falling within the protection of the First Amendment" (*Burton* v. *Municipal Court* (1968) 68 Cal.2d 684, 691 [68 Cal.Rptr. 721, 441 P.2d 281]), "any prior restraint on expression bears a heavy presumption against its constitutional validity." (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 657 [119 Cal.Rptr. 468, 532 P.2d 116]; see, e.g., *Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 419 [29 L.Ed.2d 1, 5, 91 S.Ct. 1575].) The fact that such expression takes the form of picketing[12] does not, without more, diminish

---

[11]This inquiry should be made with particular care in cases such as this because "the granting of temporary injunctions in labor disputes usually has the effect of determining and terminating the entire controversy." (*McKay, supra,* at p. 330.) "Injunctions in labor disputes have not generally proved to be an effective means of settling them; frequently they have aggravated rather than allayed a conflict." (*Park & T. I. Corp.* v. *Int. etc. of Teamsters* (1946) 27 Cal.2d 599, 608-609 [165 P.2d 891, 162 A.L.R. 1426].)

[12]Respondents seek to characterize appellants' activity as picketing based upon their carrying of placards in March prior to dissolution of the temporary restraining order. Appellants and amici focus instead upon the activity occurring in April, which they describe as "leafletting." Relying upon language in Justice Traynor's opinion in *Park & T. I. Corp.* v. *Int. etc. of Teamsters, supra,* 27 Cal.2d 599, 606-607, appellants contend that the activity that occurred in April, which was the activity that was enjoined, must be considered apart from that which earlier occurred. As Justice Traynor indicated, otherwise legal activities cannot be enjoined based upon past illegal acts if, at the time an injunction is requested, they have been purged of the elements that made them unlawful. (*Ibid.*) We are inclined to agree with appellants on this issue. However, we need not determine whether the restricted activity constituted "picketing" as we conclude that, even if the activity in question could be so characterized, appellants were nonetheless engaging in a constitutionally protected activity and that in the circumstances of this case it should not have been enjoined. In the

its protection under the First Amendment. ■ Thus, on the authority of *Thornhill* v. *Alabama, supra,* 310 U.S. 88 and *Carlson* v. *California* (1940) 310 U.S. 106 [84 L.Ed. 1104, 60 S.Ct. 746], the California Supreme Court long ago declared that "the right to picket peacefully and truthfully is one of organized labor's lawful means of advertising its grievances to the public, and as such is guaranteed by the Constitution as an incident of freedom of speech. [Citations.]" (*McKay* v. *Retail Auto. S. L. Union No. 1067, supra,* 16 Cal.2d at pp. 319-320.)

Moreover, where, as here, the picketing or leafletting takes place in a public place, it is entitled to greater protection than might otherwise be true. "[U]se of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication . . . must not, in the guise of regulation, be abridged or denied." (*Hague* v. *C. I. O., supra,* 307 U.S. 496, 515-516 [83 L.Ed. 1423, 1436-1437]; see *United States* v. *Grace* (1983) 461 U.S. 171, 177-178 [75 L.Ed.2d 736, 743, 744, 103 S.Ct. 1702, 1707, 1708].) Our own Supreme Court has held that informational picketing and demonstration require a *compelling* government interest to justify any restriction put upon them in such public areas. (*In re Berry, supra,* 68 Cal.2d 137, 154.)

Picketing may be restrained only when it is conducted in an unlawful manner or for an unlawful purpose. (See *Teamsters Union* v. *Vogt, Inc.* (1957) 354 U.S. 284, 294 [1 L.Ed.2d 1347, 1353, 77 S.Ct. 1166].) Thus, for example, restriction is allowed if the picketing is violent (*Drivers Union* v. *Meadowmoor Co.* (1941) 312 U.S. 287 [85 L.Ed. 836, 61 S.Ct. 552, 132 A.L.R. 1200]), if it blocks access to the business picketed (*Kaplan's Fruit & Produce Co., Inc.* v. *Superior Court, supra,* 26 Cal.3d 60), or if it interferes "with the municipality's interest in protecting the public health, safety, or order in assuring the efficient and orderly use of the streets and parks for their primary purposes." (*In re Hoffman* (1967) 67 Cal.2d 845, 849 [64 Cal.Rptr. 97, 434 P.2d 353].) If the manner in which labor picketing is carried on is not violent or otherwise unlawful, the picketing may then only be enjoined if it seeks to achieve an unlawful purpose. Thus, an injunction against peaceful labor picketing will be sustained if the picketing seeks to achieve an objective that is "counter to state policy in a domain open to state regulation." (*Teamsters Union* v. *Vogt, supra,* 354 U.S. at p. 291 [1 L.Ed.2d at p. 1352]; accord, *Giboney* v. *Empire Storage Co.* (1949) 336 U.S. 490 [93 L.Ed. 834, 69 S.Ct. 684]; *Hughes* v. *Superior*

discussion that follows we sometimes refer to the activity in question (i.e., that which was enjoined) as "picketing" despite our recognition that it should more accurately be described as leafletting.

*Court* (1950) 339 U.S. 460 [94 L.Ed. 985, 70 S.Ct. 718]; *Teamsters Union* v. *Hanke* (1950) 339 U.S. 470 [94 L.Ed. 995, 70 S.Ct. 773, 13 A.L.R.2d 631]; *Building Service Union* v. *Gazzam* (1950) 339 U.S. 532 [94 L.Ed. 1045, 70 S.Ct. 784]; *Carpenters Union* v. *Ritter's Cafe, supra,* 315 U.S. 722 [86 L.Ed. 1143]; *Allen-Bradley Local* v. *Board* (1942) 315 U.S. 740 [86 L.Ed. 1154, 62 S.Ct. 820]; *United Farm Workers of America* v. *Superior Court* (1975) 14 Cal.3d 902, 911-912 [122 Cal.Rptr. 877, 537 P.2d 1237].)

█ Respondents do not genuinely contend that appellants' activity can be restrained because it was violent or otherwise conducted in an unlawful manner. Instead, their claim is that the objective of that activity—which they characterize as economic coercion—was designed to place the targeted board members in a personal financial conflict of interest. This objective is claimed to be unlawful on the ground that it contravenes the state policy of "preserving the integrity of the local legislative process" manifest in certain state constitutional, statutory and common law prohibitions of "legislative bribery."

In our view this contention cannot be sustained either on the facts of this case or the legal theories upon which respondents' argument rests. We examine the facts and the law in turn.

1.

The primary evidence of the objective of appellants' activity is the unrebutted declaration of Laura Michaelis, the president of CSEA Chapter 44, that the purpose of the picketing was "to inform [the public] of the issues involved in the negotiations between CSEA and Pittsburg Unified School District in order that the public may in turn express their views to the elected members of the School District's Governing Board."[13] The activity that

---

[13]Ms. Michaelis' declaration states in its entirety as follows: "On April 15, 1981, at approximately 3:00 P.M. I received a telephone call from M. Frazzini, CSEA Attorney, informing me that the temporary restraining order was dissolved. She advised me not to picket Board member's offices on Railroad Avenue but rather to continue informational leafleting only. Based on this advise [*sic*] on April 15 and 16, 1981, from approximately 4:00 to 5:00 P.M. on a public sidewalk in front of offices of Nancy Parent and Marilyn Cacciola, I and approximately six other members of CSEA handed out informational leaflets. [¶] We carried no picket signs and we did not interfere with business activities of any individual or attempt to prevent or dissuade any person from entering or leaving the offices in question. We do not intend to picket the offices in question but rather to distribute leaflets to pedestrians in order to inform them of the issues involved in the negotiations between CSEA and Pittsburg Unified School District in order that the public may in turn express their views to the elected members of the School District's Governing Board. [¶] I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. [¶] Executed this 17th day of April, 1981, at Martinez, California."

actually took place is entirely consistent with this declared purpose. For one hour each day members of CSEA passed out leaflets on the public sidewalk in front of the business premises of respondents Parent and Cacciola. The union members did not obstruct access to respondents' offices nor did they urge employees or clients to cease work or patronage of these businesses. The leaflets that were handed to interested passers-by identified CSEA, described the collective bargaining issues in dispute, listed the names and telephone numbers of board members and urged the reader of the leaflet to "let the school board members know you care about people who care about the Children of Pittsburg. Give them a call and tell them to settle negotiations Now."[14]

Respondents' contention that, notwithstanding the foregoing evidence to the contrary, appellants were really engaged in an economic boycott is predicated on the fact that appellants' activity took place in front of respondents' private business premises. Respondents claim that although appellants were not explicitly urging a boycott of these businesses such a message was implicit in the location of their activity.

However, the only indications in the record of the effect of appellants' activity are contained in the declarations of respondents Parent and Cacciola. Parent stated that her employees had "reservations" about crossing the picket line and that some clients "may have reservations about doing business" with her. Cacciola stated that she was "deeply concerned about the adverse affect [*sic*] which this picketing may have on [her] business."

Respondents' statements represent no more than the assertion of fears and apprehensions. There is no evidence that any of their employees or clients were in fact prevented or discouraged from entering respondents' premises and carrying out their business. As noted earlier, appellants insisted that they never attempted to prevent or discourage anyone from doing business with respondents; these denials are entirely uncontradicted in the record and there is no basis upon which to find them untrue.

---

[14]Declarations earlier filed by several CSEA members involved in the picketing that was restrained in March similarly disclaimed any intent to discourage anyone from doing business with respondents. For example, Paul Greenup stated in his declaration that "[a]t no time did I or any other picket that I saw converse with anyone to encourage the cessation of business activities with either PARENT, CACCIOLA or any other individual employed in the buildings of CACCIOLA or PARENT, or having an office in either of said buildings, or any other office near the picketing site. By picketing, I was not attempting in any way to prevent the public or business associates of PARENT and CACCIOLA or any other business located in the same building with PARENT and CACCIOLA from conducting business with these Governing Board members or [their] businesses." Michael Aidan, the CSEA Field Representative, asserted in his declaration that "[t]he picketing of board member offices has not been intended as, and is not, an attempt to influence any board member by economic means."

■ "It is a fundamental principle," as applicable in connection with labor controversies as in any other context, "that the drastic sanctions of equity may not be invoked without a detailed showing of specific facts justifying such relief. [Citation.]" (*McKay* v. *Retail Auto. S. L. Union 1067, supra,* 16 Cal.2d 311, 320.) As the proposition has alternatively been stated by the United States Supreme Court, ". . . it is of prime importance that no constitutional freedom, least of all the guarantees of the Bill of Rights, be defeated by insubstantial findings of fact screening reality." (*Drivers Union* v. *Meadowmoor Co., supra,* 312 U.S. 287, 293 [85 L.Ed. 836, 841]; accord *NAACP* v. *Claiborne Hardware Co., supra,* 458 U.S. 886, 924 [73 L.Ed.2d 1215, 1243].)

■ Injunctions are granted to prevent threatened infraction of rights and not to allay fears. (*Northrop Corporation* v. *Madden* (S.D.Cal. 1937) 30 F.Supp. 993, 995.) " '[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.' " (*Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503, 508 [21 L.Ed.2d 731, 739, 89 S.Ct. 733], quoted in *Police Department of Chicago* v. *Mosley* (1972) 408 U.S. 92, 101 [33 L.Ed.2d 212, 220 92 S.Ct. 2286].) Nor may such a right be abridged "simply because its exercise may be 'annoying' to some people." (*Coates* v. *City of Cincinnati* (1971) 402 U.S. 611, 615 [29 L.Ed.2d 214, 218, 91 S.Ct. 1686].)

Statements in respondents' declarations such as, "[a] picket line outside my office has deprived me of . . . my right to earn a living" and "I am being deprived of . . . my right to earn a living" are not assertions of fact but mere conclusions. ■ "A complaint for an injunction which alleges only general conclusions, not warranted by any pleading of facts, does not state a cause of action to enjoin the acts complained of. [Citations.]" (*E. H. Renzel Co.* v. *Warehousemen's Union* (1940) 16 Cal.2d 369, 373 [106 P.2d 1]; accord, *California* v. *Latimer* (1938) 305 U.S. 255, 260 [83 L.Ed. 159, 162, 59 S.Ct. 166].)

■ In short, our independent examination of the whole record discloses no substantial evidence providing reason to believe either that appellants intended an economic boycott of respondents' businesses or that appellants' activity actually effected respondents' economic well-being adversely. If the guarantees of the First Amendment are to be taken seriously, rather than merely to receive lip service, free expression cannot validly be inhibited absent a compelling evidentiary showing of the need to do so sufficient to overcome the heavy presumption that such an inhibition is constitutionally invalid. (*Organization for a Better Austin* v. *Keefe, supra,* 402 U.S. 415,

419 [29 L.Ed.2d 1, 5]; *Wilson* v. *Superior Court, supra,* 13 Cal.3d 652, 657.)[15]

The evidence is also inadequate to support the claims that appellants' concerted activity can constitutionally be restricted because the location of that activity is unrelated to the labor dispute between appellants and the District and because, in any event, there are other locations at which appellants could communicate just as effectively with interested citizens.

With respect to the first of these contentions respondents rely almost entirely on an opinion of a New Jersey trial court restraining police officers from picketing city council members places of employment. (*Kulish* v. *Hillside Policemen's Benevolent Assn. Local No. 70* (1973) 124 N.J.Super. 263 [306 A.2d 85].) The chief basis for the court's conclusion that the locations of the picketing were unrelated to the labor dispute between the officers and the city council was that "almost all" of the places picketed were "outside of the Township where defendants' message is not likely to reach voters and taxpayers of the Township." The court also found that the picketing entailed "a substantial risk of potential harm to totally neutral third persons," that is, the council members' employers and their customers. The facts of the New Jersey case are readily distinguishable from those of the instant case. First, appellants conducted their concerted activity at an apparently well-travelled place within the school district in a manner seemingly calculated to communicate with voters and taxpayers of the District. Moreover, as we have explained, there simply is no evidence that this activity had any adverse effect on respondents or on neutral third parties. (Compare *Holt* v. *Superior Court* (1950) 100 Cal.App.2d 403, 406 [223 P.2d 881], disapproved in *Environmental Planning & Information Council* v. *Superior Court* (1984) 36 Cal.3d 188, 195, fn. 6 [203 Cal.Rptr. 127, 680 P.2d 1086].)

Respondents' assertion that appellants could communicate their message just as effectively elsewhere in the City of Pittsburg is also not substantiated in the record, which is entirely silent on this question. The scant evidence indicates only that appellants' activity took place on a public sidewalk in front of an undescribed commercial "complex" and alongside a main thoroughfare of the City of Pittsburg. It is established that "'public

---

[15]Because of the failure of their evidence, it is unnecessary for us to address respondents' broad contention that the "economic coercion" they perceive is unprotected by the First Amendment. In this regard, however, see *NAACP* v. *Claiborne Hardware Co., supra,* 458 U.S. 886 [73 L.Ed.2d 1215]; see also Harper, *The Consumer's Emerging Right to Boycott: NAACP v. Claiborne Hardware and its Implications for American Labor Law* (1984) 93 Yale L. J. 409.

places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.' [Citations.]" (*United States* v. *Grace, supra,* 461 U.S. 171, 177 [75 L.Ed.2d 736, 743, 103 S.Ct. 1702, 1706-1707].) In such places, the power of the government to restrict expressive conduct is extremely limited. (*Ibid.*) Moreover, "[i]t is immaterial that another forum, equally effective may have been available . . . . As stated in *Schneider* v. *State* [1939] 308 U.S. 147, 163 . . .: '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" (*In re Hoffman, supra,* 67 Cal.2d 845, 852, fn. 7.)

## 2.

Putting aside their failure to make the detailed showing of specific facts necessary to justify the restraint imposed by the trial court, respondents have also failed to advance a tenable legal basis for their assertion that appellants' activity sought to achieve an unlawful purpose. This legal issue must be addressed because it bears upon respondents' pending claim for damages.

## A.

As earlier noted, respondents maintain that the activities in issue constitute a corrupt practice—which they also label "legislative bribery"—violative of a state policy to preserve "the integrity of the local legislative process." Although they find this state policy expressed also in constitutional and Penal Code provisions relating to the bribery of state legislators,[16] it is clear that respondents rely most heavily on Education Code section 35230, which as pertinent provides that: "The offering of any valuable thing to any member of the governing board of any school district, with the intent to influence his action in regard to . . . the making of any contract to which the board of which he is a member is a party, or the acceptance by any member of the governing board of any valuable thing,

---

[16]Article IV, section 15, of the California Constitution provides that "A person who seeks to influence the vote or action of a member of the Legislature in the members' legislative capacity by bribery, promise of reward, intimidation, or other dishonest means, or a member of the Legislature so influenced, is guilty of a felony."

Penal Code section 85 provides that "Every person who gives or offers to give a bribe to any Member of the Legislature, or to another person for him, or attempts by menace, deceit, suppression of truth, or any corrupt means, to influence a member in giving or withholding his vote, or in not attending the house or any committee of which he is a member, is punishable by imprisonment in the state prison for two, three or four years."

with corrupt intent, is a misdemeanor."[17] Respondents contend in their brief that "implicit in the setting up of a picket line in front of a business is the promise that, if the demands of the pickets are satisfied, the picketing will cease. That implied promise becomes a 'valuable thing' within the meaning of Education Code section 35230." To buttress this argument, respondents additionally rely on the common law conflict of interest doctrine codified in Government Code section 1090, which provides that public officials such as respondents "shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." (See also Ed. Code, § 35233.) Respondents state that the objective of the common law rule upon which this statute is based "is to prevent public officers from acting in circumstances in which their public duty *might* conflict with their private interests." (Original italics.) Thus, they claim, it applies not only with respect to contracts but "whenever a public official places himself in a position in which a temptation might arise to subordinate public duties to private interests." According to respondents, Education Code section 35230 and Government Code section 1090 "seek to ensure that public officers in the discharge of their duties are absolutely free from *any influence* other than that which flows directly out of their obligations to the public at large." (Original italics.)

However, accepting for the moment their formulation of the statutory purpose, respondents fail to recognize that the influence from which they wish to free themselves *does* flow directly out of their public obligations. Respondents' imaginative attempt to transform appellants' activity into "bribery" has no support in the statutes upon which they rely or the case law, would have disastrous consequences for our form of representative government and is fundamentally at war with the First Amendment.

Cases involving public officials that find a corrupt practice or conflict of interest proscribed by statute or by the common law characteristically involve situations in which the official received a direct monetary benefit as a result of a financial relationship with a private enterprise that did business with a public agency of which the official was a member. (See, e.g., *Stigall* v. *City of Taft* (1962) 58 Cal.2d 565 [25 Cal.Rptr. 441, 375 P.2d 289] [member of city council an owner of a plumbing company awarded a contract]; *People* v. *Elliott* (1953) 115 Cal.App.2d 410 [252 P.2d 661] [attorney-client relationship between board member and bus company]; *People*

---

[17]This language was evidently adopted from the definition of "bribe" set forth in Penal Code section 7, subdivision 6, as "anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his action, vote or opinion, in any public or official capacity."

v. *Darby* (1952) 114 Cal.App.2d 412 [250 P.2d 743] [board member received rents as landlord of company awarded high percentage of gross ice cream sales to the school district].) No case has found a violation of statutes such as are relied upon by respondents as a result of an implied promise to cease activities otherwise protected by the First Amendment on the ground the cessation of such activities would confer an economic benefit on a public official. Indeed, we are unable to find any pertinent case involving the conflict of interest or bribery of a public official in which such a novel contention was ever advanced.

In the absence of case law directly on point, we think the opinion of the United States Supreme Court in *Brown* v. *Hartlage* (1982) 456 U.S. 45 [71 L.Ed.2d 732, 102 S.Ct. 1523], is instructive. The court held in that case that the application of an "anti-vote buying" statute utilizing language similar to that of Education Code section 35230 was not valid when applied to a candidate's promise that if elected he would serve at a salary less than that " 'fixed by law.' " (*Brown* v. *Hartlage, supra,* 456 U.S. 45, 47 [71 L.Ed.2d 732, 737].) Though it acknowledged that the states have a legitimate interest in preserving the integrity of their electoral processes, the court held that a state could not seek to restrict a candidate's offer of ideas to the voters absent demonstration of a compelling interest. (*Id.,* at pp. 52-54 [71 L.Ed.2d at pp. 740-741].) "The fact that some voters may find their self interest reflected in a candidate's commitment does not place that commitment beyond the reach of the First Amendment. We have never insisted that the franchise be exercised without taint of individual benefit; indeed, our tradition of political pluralism is partly predicated on the expectation that voters will pursue their individual good through the political process, and that the summation of these individual pursuits will further the collective welfare. So long as the hoped-for personal benefit is to be achieved through the normal processes of government, and not through some private arrangement, it has always been, and remains, a reputable basis upon which to cast one's ballot." (*Id.,* at p. 56 [71 L.Ed.2d at pp. 742-743], fn. omitted.) The court refused to characterize the candidate's promise to take less salary as a bribe. (*Id.,* at p. 57 [71 L.Ed.2d at p. 743].) Crucial to the court's decision was the fact that his statements were made openly and were subject to criticism from his political opponent and to the scrutiny of voters. Such statements were very different in character from corrupting private agreements and solicitations historically recognized as unprotected by the First Amendment. (*Id.,* at pp. 56-57 [71 L.Ed.2d at pp. 742-743].) The situation presented to us in the instant case, though not apposite in all respects, is nonetheless similar to that in *Brown* v. *Hartlage* in a number of particulars. Concerted activities directed at elected officials, like the commitments of candidates for public office, are a traditional means of express-

ing views on public issues, are openly subject to public scrutiny, relate to the accountability of public officials, are open to refutation by those who hold opposing views, and are ordinarily protected by the First Amendment. The fact that the self interest of such officials may be affected by the public response to activities openly directed against them does not deprive those activities of constitutional protection.

We recognize that respondents are only engaged in their public duties part time and rely for their livelihoods on private employment; *but they nonetheless remain public officials.* Public office is no place for the thin-skinned. Those who function in the public arena "must be prepared to withstand . . . the protest and controversy which their earlier actions and statements have generated." (*In re Kay* (1970) 1 Cal.3d 930, 936, fn. 3 [83 Cal.Rptr. 686, 464 P.2d 142], citing *Payroll Guar. Ass'n.* v. *Board of Education* (1945) 27 Cal.2d 197, 202-203 [163 P.2d 433, 161 A.L.R. 1300]; see also *Craig* v. *Harney* (1947) 331 U.S. 367, 376 [91 L.Ed. 1546, 1552, 67 S.Ct. 1249], applying this admonition to members of the judicial branch.) If such public protest could be restrained on the grounds alleged by respondents in this case, then significant numbers of public officials could easily insulate themselves from pressures of public office that are not only traditional in our society, but vital to our sometimes boisterous form of representative democracy, which contemplates that an officeholder's constituents "can register disapproval of his conduct and seek redress of grievances." (*In re Kay, supra,* 1 Cal.3d at p. 939.) The First Amendment would thus become a dead letter with respect to a form of expression to which its application has always been considered particularly essential and therefore entitled to the most stringent protection. Thus, in *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254 [11 L.Ed.2d 686], the United States Supreme Court expressed "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that [*such debate*] *may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.*" (*Id.,* at p. 270 [11 L.Ed.2d at p. 701], italics added; see also, *Rosenblatt* v. *Baer* (1966) 383 U.S. 75, 85 [15 L.Ed.2d 597, 605, 86 S.Ct. 669]; *Wilson* v. *Superior Court, supra,* 13 Cal.3d 652, 657-658.) As suggested in *Carey* v. *Brown* (1980) 447 U.S. 455 [65 L.Ed.2d 263, 100 S.Ct. 2286], the elected official who has voluntarily chosen to enter the public arena has to a considerable extent " 'waived' his right to privacy with respect to a challenge to his views on significant issues of social and economic policy." (*Id.,* at p. 469 [65 L.Ed.2d at p. 275], fn. omitted.) Criticism of this sort may well have adverse economic consequences for those numerous elected officials who legitimately derive all or a portion of their income from a private enterprise;

but this is no basis for necessarily withholding from their critics the benefits of the First Amendment.

Thus, if we felt it necessary to construe Education Code section 35230 in the manner urged by respondents, we would be obliged to declare it unconstitutional.

For reasons similar to those just set forth, we also conclude that neither Government Code section 1090 prohibiting conflicts of interest[18] nor the common law conflict of interest doctrine sweeps so wide as to render illegal the activity undertaken in this case.

Relying upon the First Amendment, state and federal courts have refused to find a conflict of interest in situations in which, the "conflict" was considerably more apparent than it is in this case and where the objective sought to be achieved was more plausibly unlawful than the objective sought by appellants here. For example, in *Woodland Hills Residents Assn., Inc.* v. *City Council* (1980) 26 Cal.3d 938 [164 Cal.Rptr. 255, 609 P.2d 1029], the California Supreme Court held that city council members were not disqualified from considering and voting on a proposed subdivision by reason of campaign contributions made to council members by the real estate developer, its engineering firm, and its attorneys. The court concluded that political contributions involve an exercise of a fundamental freedom protected by the First Amendment and by article I, section 2, of the California Constitution. "To disqualify a city council member from acting on a development proposal because the developer had made a campaign contribution to that member would threaten constitutionally protected political speech and associational freedoms." (*Id.,* at p. 946.) Manifestly, the political contributions that were made in *Woodland Hills* represent a more direct and less visible—and for those reasons more arguably pernicious—attempt to influence the official acts of elected officials than the attempt made by appellants in this case. If, as our Supreme Court held, those political contributions involved the exercise of a constitutionally protected right (*ibid.*), it is difficult to conclude that appellants' activity is not also protected. Certainly the public policy that encourages the giving and receiving of campaign contributions is no stronger than that which encourages the free dissemination of information concerning the facts of a public sector labor dispute involving a local school system. (See Gov. Code, § 3547, subd. (e).)

---

[18]Government Code section 1090 provides: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity . . . ."

The opinion of the United States Supreme Court in *Eastern R. Conf.* v. *Noerr Motors, supra,* 365 U.S. 127 [5 L.Ed.2d 464], is also pertinent. That case involved an assertedly "vicious, corrupt, and fraudulent" publicity campaign by various railroad interests designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business and to create an atmosphere of distaste for truckers among the general public and to impair relations existing between truckers and their customers. (*Id.,* at p. 129 [5 L.Ed.2d at p. 466].) The trial court, finding that the railroads' publicity campaign was "malicious and fraudulent," concluded that it violated the Sherman Act. This judgment, which had been affirmed by the Court of Appeals for the Third Circuit (273 F.2d 218), was unanimously reversed by the Supreme Court on the ground that no violation of the Sherman Act can be predicated upon mere attempts to influence the passage or enforcement of laws. (365 U.S. at pp. 135-136 [5 L.Ed.2d at pp. 469-470].) The court reached this result for two reasons. First, it pointed out that, to a very large extent, the concept of representative government "depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act." (*Id.,* at p. 137 [5 L.Ed.2d at p. 471], fn. omitted.) The court went on to note that "[s]econdly, and of at least equal significance, such a construction of the Sherman Act would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." (*Id.,* at pp. 137-138 [5 L.Ed.2d at p. 471]; accord, *Mine Workers* v. *Pennington, supra,* 381 U.S. 657, 669-672 [14 L.Ed.2d 626, 635-637]; *Franchise Realty, Etc.* v. *S. F. Loc. Joint Exec. Bd., supra,* 542 F.2d 1076, cert. den., 430 U.S. 940 [51 L.Ed.2d 787, 97 S.Ct. 1571].)[19]

*Noerr* is relevant here for several reasons. First, the activity challenged in that case was more conceivably inimical to federal policy regarding restraint of trade than appellants' activity is inconsistent with state policy regarding corrupt practices and conflicts of interest.[20] Further, we can no

---

[19]"While *Noerr* and *Pennington* involved attempts to influence legislative and executive action, it is now clear that the same principles govern efforts by citizens or groups to influence administrative and judicial proceedings. (*California Motor Transport Co.* v. *Trucking Unlimited* [*supra*] . . . ." (*Franchise Realty, Etc., supra,* 542 F.2d at p. 1080, fn. 3.)

[20]Although it concluded that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take

more easily impute to our Legislature an intent to infringe First Amendment rights through enactment of the Education and Government Code provisions relied upon by respondents in this case than the Supreme Court could impute such intent to Congress due to its adoption of the Sherman Act. *Noerr* also demonstrates once again that the protections of the Bill of Rights are not in any way diminished simply because the political activity in question relates to economic issues subject to governmental regulation or because those who undertake such activity have a financial stake in its outcome. (See also, *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 770 [48 L.Ed.2d 346, 363, 96 S.Ct. 1817]; *California Transport* v. *Trucking Unlimited, supra,* 404 U.S. 508, 510-511 [30 L.Ed.2d 642, 646-647, 92 S.Ct. 609] and *Matossian* v. *Fahmie* (1980) 101 Cal.App.3d 128, 137 [161 Cal.Rptr. 532] and cases there cited.)

Despite appellants' economic interests there can be no serious doubt that their activity focused upon a public issue and was essentially political in nature. As the United States Supreme Court has observed in a case involving a labor dispute between a teachers union and a school board, "decision-making by a public employer is above all a political process. The officials who represent the public employer are ultimately responsible to the electorate, . . . Through exercise of their political influence as part of the electorate, the employees have the opportunity to affect the decisions of government representatives who sit on the other side of the bargaining table. Whether these representatives accede to a union's demands will depend upon a blend of political ingredients, including community sentiment about unionism generally and the involved union in particular, the degree of taxpayer resistance, and the views of voters as to the importance of the service involved and the relation between the demands and the quality of service." (*Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209, 228 [52 L.Ed.2d 261, 280, 97 S.Ct. 1782]; see also *id.*, at p. 257 [52 L.Ed.2d at p. 298] (conc. opn. of Powell, J.) [There is no basis "for distinguishing 'collective bargaining activities' from 'political activities' so far as the interests protected by the First Amendment are concerned. Collective bargaining in the public sector is 'political' in any meaningful sense of the word."]; Summers, *Public Employee Bargaining: A Political Perspective* (1974) 83 Yale L.J. 1156, 1159; Note, *Labor Picketing and Commercial Speech: Free Enterprise Values in the Doctrine of Free Speech* (1982) 91 Yale L.J. 938, 955.)

---

particular action with respect to a law that would produce a restraint or a monopoly," the court in *Noerr* conceded that "such associations could perhaps, through a process of expansive construction, be brought within the general proscription of 'combination[s] . . . in restraint of trade, . . . .'" (365 U.S. 127, 136 [5 L.Ed.2d 464, 470].)

The essentially political nature of appellants' activity emerges not only from the public aspect of the collective bargaining process in which they were engaged, but as well from the intensity of public concern regarding the costs and quality of public education.[21] Because of this, both the United States and California Supreme Courts have held that speech or speech-related activities focusing upon this subject are entitled to a high level of protection under the free speech clause of the First Amendment. (See, e.g., *Pickering* v. *Board of Education* (1968) 391 U.S. 563, 571-573 [20 L.Ed.2d 811, 818-820, 88 S.Ct. 1731]; *L. A. Teachers Union* v. *L. A. City Bd. of Ed.* (1969) 71 Cal.2d 551, 557-558 [78 Cal.Rptr. 723, 455 P.2d 827].)

Respondents' contention that appellants' activity is constitutionally unprotected because it undermines the integrity of the local legislative process is thus irreconcilable with the jurisprudence of the First Amendment, which teaches that the exposure of elected officials to public criticism does not defeat but *enhances* the integrity of representative government. As Justice Douglas has stated, "It is common knowledge that the First Amendment was adopted against the widespread use of the common law of seditious libel to punish the dissemination of material that is embarrassing to the powers-that-be." (*New York Times Co.* v. *United States* (1971) 403 U.S. 713, 724 [29 L.Ed.2d 822, 830, 91 S.Ct. 2140] (conc. opn. of Douglas, J.).

Putting aside for a moment the constitutional considerations, it is also noteworthy that the Legislature has by statute sought to insure "that the public be informed of the issues that are being negotiated upon [between public school employers and employees] and have full opportunity *to express their views on the issues to the public school employer, and to know of the positions of their elected representatives.*" (Gov. Code, § 3547, subd. (e), italics added.) Appellants' activity seems to us far more clearly consistent with the purpose of this statute than it is violative of those upon which respondents rely, which we believe were never intended to apply to traditional forms of speech, assembly, and petition. It may be noted, additionally, that public school employees are among those members of the community most likely to have "informed and definite opinions" as to issues of public importance regarding the operation of schools and that it is therefore essential that they are able to speak out freely. (*Pickering* v. *Board of Education, supra,* 391 U.S. 563, 572 [20 L.Ed.2d 811, 819]; *Swilley* v. *Alexander* (5th Cir. 1980) 629 F.2d 1018, 1021.)

---

[21]As noted in *Madison Sch. Dist.* v. *Wisconsin Emp. Rel. Comm'n* (1976) 429 U.S. 167, 177 [50 L.Ed.2d 376, 386, 97 S.Ct. 421], "there is virtually no subject concerning the operation of the school system that could not also be characterized as a potential subject of collective bargaining."

Just as judges must be prepared to accept and should not be swayed by public criticism (*Craig* v. *Harney, supra,* 331 U.S. 367, 376 [91 L.Ed. 1546, 1552]), respondents, as public officials, are "'supposed to be men [and women] of fortitude, able to thrive in a hardy climate.'" (Tribe, American Constitutional Law (1978) at p. 625, quoting *Craig* v. *Harney, supra.*) Members of the governing boards of local school boards, who are not infrequently at the center of public controversy, simply cannot refashion the concept of a conflict of interest to insulate themselves from peaceful and openly exerted efforts to influence their official acts where, as here, those efforts are not definitively proscribed by valid statute and are of a sort traditionally protected by the Bill of Rights.

As the record in this case demonstrates none of the grave abuses that provide occasion for permissible restriction of the liberties asserted by appellants under the First Amendment, and because appellants' activity did not seek to achieve an unlawful objective,[22] the judgment is reversed. The matter is remanded to the superior court, which is directed to dismiss the complaint for declaratory relief and damages.

Rouse, J., and Smith, J., concurred.

Petitions for a rehearing were denied May 15, 1985, and respondents' petition for review by the Supreme Court was denied July 18, 1985.

---

[22]Because of these conclusions it is unnecessary for us to address the question whether Code of Civil Procedure section 527.3 deprived the trial court of jurisdiction to issue the injunction it rendered. (Although this issue was raised below, appellants have not pursued it before us.) Nor, for the same reason, is it necessary for us to inquire whether the injunction, set forth, *ante,* at fn. 5, is unconstitutionally overbroad.